**COLEMAN & COMPANY SECURITIES, INC.,**
Petitioner,

v.

**The GIAQUINTO FAMILY TRUST, et al., Respondents.**

**Aaron Jones Yorke, IV, Intervenor–Petitioner,**

v.

**The Giaquinto Family Trust, et al., Respondents.**

**David J. Chester, Intervenor–Petitioner,**

v.

**The Giaquinto Family Trust, et al., Respondents.**

No. 00 CIV. 1632(DC).

United States District Court, S.D. New York.

Sept. 27, 2002.

Kurzman Eisenberg Corbin Lever & Goodman, LLP by Andrew J. Goodman, Esq., New York City, for Petitioner.

Pryor, Cashman, Sherman & Flynn, LLP by Mitchell C. Stein, Esq., Todd R. Bartos, Esq., New York City, Stark & Stark, P.C. by Craig S. Hilliard, Princeton, NJ, for Respondents.

Hunter & Associates by Alexander M. Hunter, III, Esq., New York City, for Intervenor–Petitioner David J. Chester.

Jenkens & Gilchrist Parker Chapin LLP by Richard G. Cushing, Esq., New York City, for Intervenor–Petitioner Aaron Jones Yorke, IV.

## OPINION

CHIN, District Judge.

This petition to permanently stay a securities arbitration turns on whether the underlying claims are time-barred. The answer in turn depends upon when respondents knew or should have known of the existence of their claims, and thus whether they may receive the benefit of the discovery rule or equitable tolling. For the reasons set forth below, I conclude that respondents had sufficient notice of their claims for a period that exceeds the applicable statutes of limitation, and thus the claims are time-barred as a matter of law. Accordingly, the petitioners' motions for summary judgment are granted.

## BACKGROUND

### A. Prior Proceedings

On November 16, 1999, respondents, all residents of New Jersey, filed an arbitration claim before the National Association of Securities Dealers ("NASD") against New York broker-dealer Coleman & Company Securities, Inc. ("Coleman") and affiliated individuals. The Statement of Claim asserted eighteen (or more) claims, including fraud, negligence, breach of contract, and securities violations.

Coleman filed a petition in New York Supreme Court on February 17, 2000, seeking a permanent stay of several of the claims. The petition asserted that the claims based upon negligence and violations of New Jersey and federal securities laws were barred by the applicable statutes of limitation. See N.Y. C.P.L.R. §§ 7502(b), 7503(c) (McKinney 1998). The state court imposed a temporary stay of the arbitration pending resolution of the petition. On March 3, 2000, respondents removed the case to this Court on the basis of diversity jurisdiction. I continued the temporary stay. Aaron Jones Yorke, IV and David J. Chester, individual defendants in the arbitration proceeding, were permitted to enter this proceeding as intervenor-petitioners.[1] Respondents have withdrawn their federal securities law

---

1. References to "petitioners" are to Coleman, Yorke, and Chester.

claims. Chester has separately moved to permanently stay all claims against him.

By memorandum decision dated November 8, 2000, I denied respondents' motion to dismiss the complaint. *Coleman & Co. Sec.,* No. 00 Civ. 1632(DC), 2000 WL 1683450 (S.D.N.Y. Nov. 9, 2000). I concluded that by expressly providing for New York law to govern the arbitration itself, the parties intended for the Court, rather than an arbitrator, to decide petitioners' statute of limitations defenses. *Id.* at *4. The parties engaged in discovery, and the statute of limitations issue is now before the Court as petitioners have moved for summary judgment.

As will be discussed below, respondents' claims of negligence are subject to a three-year limitations period under New York law. The New Jersey Uniform Securities Law (the "USL") sets out a two-year period that runs from the date of the transaction or investment advice, or from discovery of the wrong.

Respondents' claims flow from their relationship with James Jedrlinic, an investment advisor and broker. As for the negligence claims, the petition alleges that the claims were filed in November 1999, more than three years after both the last transaction Jedrlinic facilitated for respondents, in August 1996, and Jedrlinic's departure from Coleman in September 1996. Respondents argue that even though Jedrlinic no longer worked for Coleman, he remained a principal owner of the company until October 1997, and thus there is an issue of fact regarding Coleman's "control and involvement" in supervising Jedrlinic until that time. Respondents also argue there is an issue of fact regarding whether they are entitled to equitable tolling of the statute of limitations in light of Jedrlinic's fraudulent concealment.

As for violations of the USL, petitioners assert that the last transaction Jedrlinic effected for respondents while at Coleman occurred in August 1996, and that respondents were or should have been aware of their claims, at the latest, by October 1997. Respondents contend that an issue of fact exists as to when they discovered the wrong.

## B. *Facts*

For the purposes of this motion, which is based solely on the timeliness of respondents claims, I assume the existence of fraud underlying the claims. As for facts concerning the timeliness of the claims, I construe them in the light most favorable to respondents, the non-moving parties. The relevant facts are as follows:

### 1. *The Giaquinto Family Meets Jedrlinic*

All respondents are relatives of the late Margaret and James Giaquinto.[2] (Statement of Claim at 3–4). Their claims flow from their relationship with Jedrlinic, an investment advisor and registered representative now in bankruptcy. (Statement of Claim at 9; Jedrlinic Dep. at 8). Jedrlinic ran his own investment advisory firm, Financial Partners Ltd., and also worked as a registered representative or broker at different brokerage firms. Jedrlinic had worked with James Giaquinto ("James"), the patriarch of the Giaquinto family, since the 1980's. (Jedrlinic Dep. at 44). In January 1990, James learned he was terminally ill. (Nancy Giaquinto–Parker Dep. at 8). He asked his daughter, Nancy Giaquinto–Parker ("Nancy"), to return to New Jersey to manage the family property

**2.** I refer to the individual and entity respondents collectively as "respondents." As the parties do not raise the issue, I assume all respondents assert the same claims and that the knowledge of one respondent may fairly be imputed to all.

management and construction business. (*Id.*).

In the spring of 1990, James held a meeting to discuss estate planning with his family and introduce them to Jedrlinic, who was working for National Insurance Associates in New Jersey. (*Id.* at 9; Jedrlinic Dep. at 27). Nancy and Viola Giaquinto ("Viola") attended the meeting. (Nancy Giaquinto–Parker Dep. at 8, 10). Neither recall any specific discussion about investment strategy.

James died in August 1990. (*Id.* at 13). About a month or so later, respondents met with Jedrlinic and Robert Alexander, the family trusts and estates lawyer, at Alexander's office. (*Id.*). Nancy, Viola, Michael Giaquinto ("Michael"), and Susan Mattis ("Susan")—all family members—attended the meeting, which primarily concerned insurance proceeds and settling the estate, and, like the first meeting, did not concern specific investment strategy. (*Id.* at 14).

### 2. *Jedrlinic Moves to Coleman and Recommends that the Family Invest in Private Companies*

In 1993, Jedrlinic began working for Coleman. Respondents remained clients of Jedrlinic and opened accounts with him there. (*See* Goodman Aff. Ex. G, Wertheim Schroder & Co. New Account Forms dated Sept. 1993 to Apr. 1994). After about a year, Jedrlinic became a shareholder of Coleman. According to a Coleman business plan, in 1995 Jedrlinic, "previously a passive investor in the firm, took

control of the organization." (Hilliard Decl. Ex. B, undated excerpt (approximately 1997) entitled "Section I: Business Plan" from Coleman Holding Corp. ("Coleman Business Plan"); *see* Jedrlinic Dep. at 36–37).[3] Chester was a managing director and Yorke was president of the firm during this period. (Jedrlinic Dep. at 38, 40; *see also* Coleman Business Plan at 1).

Initially, from 1990 to 1994, Jedrlinic invested respondents' assets in conservative instruments, such as money-market funds. (Nancy Giaquinto–Parker Dep. at 21, 43). In April 1994, respondents attended a meeting with Jedrlinic, who recommended investments in three privately held corporations: Golf–Technology Holding, Inc. ("Golf–Tech"), Jett Aire Group, Inc. ("Jett Aire"), and Hometown Express Hardware, Inc. ("Hometown").

Nancy, Viola, Michael, and Susan met with Jedrlinic in April 1994. (Nancy Giaquinto–Parker Dep. at 29). Jedrlinic generally described the business of each company, which included specialty golf clubs, jet fueling, and franchised hardware stores, respectively. (*Id.* at 31, 38–41).

Prior to the meeting, none of the respondents had any experience investing in stocks. (Giaquinto Decl. ¶¶ 3–5).[4] Jedrlinic assured respondents that the companies were safe, solid investments likely to increase in value because they would be going public in the very near future— within three or four months. (Giaquinto Decl. at ¶ 4; Viola Giaquinto Dep. at 15– 16).

---

**3.** According to the Coleman Business Plan, outside investors purchased a 60 percent share in the company in April 1996. Jedrlinic, a 36 percent shareholder, remained in control "of all treasury, CFO and compliance functions" until approximately October 1996, when the new investors demanded his resignation. (Coleman Business Plan at 2–3).

Jedrlinic remained a shareholder until October 1997. (*Id.;* Hilliard Decl. Ex. D).

**4.** References to "Giaquinto Decl." are to common paragraphs of respondents' substantially identical declarations. *See, e.g.,* Nancy Giaquinto–Parker Decl. ¶ 5; Michael Giaquinto Decl. ¶ 5; Viola Giaquinto Decl. ¶ 5; Susan Mattis Decl. ¶ 5.

At the meeting, Jedrlinic provided no prospectuses, private placement memoranda, or other documents about the companies. (Giaquinto Decl. at ¶ 5–7).[5] Respondents do not recall any specific discussion about whether these new investments carried increased risks, or why Jedrlinic was recommending them to the family at this time. (Nancy Giaquinto–Parker Dep. at 43).

Soon after the meeting, respondents invested in the companies Jedrlinic recommended. Respondents claim that Jedrlinic prepared false investor questionnaires to qualify them as suitable investors for each security, sending only the signature pages to his clients, and filling out the remainder himself. (Giaquinto Decl. at ¶ 6). Similarly, respondents indicate that Jedrlinic never sent complete stock subscription agreements, sending respondents only the signature pages. (Giaquinto Decl. at ¶ 7).

From May 1994 to August 1996, respondents made substantial investments in these and other investments Jedrlinic recommended. (Statement of Claim at 6–8). Throughout, respondents allege, Jedrlinic misrepresented the character of the investments as safe, when they were in fact speculative and illiquid.[6] Jedrlinic never informed respondents of the risks of their positions, and misrepresented that the companies were suitable short-term investments, saying that each would become public in the very near future—within three to four months. (Giaquinto Decl. at ¶¶ 5–8). In addition, Jedrlinic did not inform respondents that, in exchange for promoting the offerings, Jedrlinic and Coleman received stock in the same companies. (Giaquinto Decl. at ¶ 8; Jedrlinic Dep. at 70–71).

### 3. *Family Contact with Jedrlinic*

Periodically, respondents received updates from Jedrlinic, and from time to time, at meetings and during regular phone contacts, they expressed their concerns about the delay in the public offerings. (Nancy Giaquinto–Parker Dep. at 45). Jedrlinic consistently reassured respondents that their investments were not at risk. Respondents, who socialized occasionally with Jedrlinic and his family, and had known him since 1990, trusted his

---

**5.** Viola testified at her deposition, however, that she received and read a business plan and subscription documents for Hometown and Jett Aire in April 1994. (Viola Giaquinto Dep. at 68–70). There remains an issue of fact as to whether Nancy "might have" received Jett Aire financial information, for example, and "it might have just gotten in the pile." (Nancy Giaquinto–Parker Dep. at 94, 100 ("It [April 1996 letter from Jedrlinic to Jett Aire shareholders] might be one that just got put on the pile. I had many piles."); *id.* at 95 ("It depended on the day and it was rare that I would ever get the chance to read everything that came through the mail so, no, I did not make a practice to read everything that came.")). Similarly, Nancy may have received some documents concerning Golf–Tech. (*See id.* at 65 ("Q. Do you recall whether you got any documents after the initial subscription on Golf Tech?. A. Yes, I think we got some paper.")).

**6.** According to the Statement of Claim, the investments caused losses for respondents of more than $1.3 million. Since the filing of that Statement, however, respondents recovered approximately $695,000 invested in Sanford Airport Authority bonds. (*See* Viola Giaquinto Dep. at 19, 41; Nancy Giaquinto–Parker Dep. at 59, 60 ("Every entity involved got back their initial investment plus interest plus expense money that we had put out.")). From May 1994 through March 1995, the family invested approximately $87,500 in Hometown; $74,500 in Jett Aire; and $84,000 in Golf–Tech. (Statement of Claim at 6–8). Jett Aire and Golf–Tech apparently went bankrupt; Hometown is still a going concern, and thus the stock may have some value. (Viola Giaquinto Dep. at 25, 58).

explanations. (Nancy Giaquinto–Parker Dep. at 43, 46).

### a. *Fall 1995 Meeting*

On approximately September 30, 1995, Jedrlinic met with respondents—including Nancy, Viola, Michael, and Susan—to discuss the status of their investments. Respondents learned that approximately sixteen months after making their initial investments, Jett Aire and Hometown had still not gone public. (Viola Giaquinto Dep. at 17–18). Respondents expressed their concern, and told Jedrlinic they would like more liquidity in their accounts. (*Id.* at 10–12; 26–28; Goodman Aff. Ex. I, Sept. 30, 1995 Portfolio Appraisal (Coleman)).

At or before this meeting, Jedrlinic provided a statement of respondents' accounts labeled a "portfolio appraisal." The statement dated September 30, 1995 showed that Viola's investments had appreciated, from a total cost of $324,000 to a value of $423,000. (Goodman Aff. Ex. I, Sept. 30, 1995 Portfolio Appraisal (Coleman)). The bulk of this increase was due to shares in Golf–Tech, which cost $1.50, but according to the appraisal were trading at $7 per share.[7] (*Id.*). Hometown and Jett Aire were valued at cost, $1.25 and $1.00, respectively. Viola's handwritten notations on the appraisal, taken during the meeting with Jedrlinic, show that Golf–Tech was "not on Nasdaq yet, but is trading" over the counter. (*Id.*; Viola Giaquinto Dep. at 10; *see* Jedrlinic Dep. at 108–09). Jedrlinic also promised respondents phenomenal returns, saying that Jett Aire should grow by three or perhaps five times its value when it went public in three more months; and that Golf–Tech, apparently trading at $7, could go as high as $17–20. (Goodman Aff. Ex. I, Sept. 30, 1995 Portfolio Appraisal (Coleman)). Respondents were aware at this meeting that Hometown and Jett Aire were not yet publicly traded. (Viola Giaquinto Dep. at 17).

### b. *Jedrlinic Leaves Coleman*

In September 1996, Jedrlinic left Coleman to work for a different brokerage firm, J. Robbins, Inc. By letter dated October 22, 1996, Jedrlinic informed Viola, and she mailed an authorization to transfer her account on November 7, 1996. (Goodman Aff. Ex. K, Letter from Jedrlinic, J. Robbins, Inc. to Viola Giaquinto of 10/22/96; Viola Giaquinto Dep. at 32). In November 1996, Jedrlinic borrowed $35,000 from respondent Kathleen Giaquinto ("Kathleen").[8] (Nancy Giaquinto–Parker at 100–01).

### c. *Fall 1996 Meeting*

Respondents had another meeting with Jedrlinic in approximately October 1996. (Viola Giaquinto Dep. at 22). Respondents were not happy with Jedrlinic and the investments at this time, and expressed impatience that Hometown and Jett Aire were still not public. (*Id.* at 33). Jedrlinic provided plausible explanations for the business problems each company was experiencing. A portfolio appraisal from this period shows Jett Aire and Hometown still valued at cost, and Golf–Tech valued at $4. (Viola Giaquinto Decl. Ex. C, Oct. 31, 1996

---

**7.** Viola later sold 2,000 shares for $12,500, or an average price of $6.25 per share. (Viola Giaquinto Dep. at 51–52).

**8.** Nancy did not learn of this loan until March 1999. (Nancy Giaquinto–Parker Dep. at 100–04). Apparently, Kathleen mailed Jedrlinic a disbursement from her 401(k) plan when she left her job at Chubb Insurance. Jedrlinic borrowed the money, and executed a promissory note. Although Nancy learned of the loan in 1999, she did so when Kathleen faxed her documents that included the note and a letter from Jedrlinic dated February 7, 1997. (Nancy Giaquinto–Parker Dep. at 101).

Portfolio Appraisal (Financial Partners Ltd.)). Despite their unhappiness, respondents continued to work with Jedrlinic after he left Coleman and went to work for J. Robbins, Inc. Respondents still trusted Jedrlinic and reasoned that "he's already got our investments." (Viola Giaquinto Dep. at 33).

#### d. *Fall 1997 Meeting*

Respondents attended a similar meeting in the fall of 1997. Again, respondents expressed unhappiness that both Hometown and Jett Aire were not public, and again Jedrlinic provided reasonable explanations. (Viola Giaquinto Dep. at 29).

#### 4. *Respondents Lose Confidence in Jedrlinic*

None of the respondents had any suspicions about Jedrlinic's investments of the family's assets until, in late 1998, Jedrlinic started to avoid phone calls from respondents. (Viola Giaquinto Decl. at ¶ 10). In April 1999, Nancy learned that two life insurance policies on her sister and her brother had been foreclosed in June 1994. (Nancy Giaquinto–Parker Decl. ¶ 10, Ex. C, Letter from Alan J. Kramer, New York Life Insurance to Nancy Giaquinto–Parker of 4/8/99). Jedrlinic had supposedly been making premium payments. (*Id.*). When confronted, Jedrlinic had no explanation. (*Id.*).

### *DISCUSSION*

## A. *Applicable Law*

### 1. *Summary Judgment*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Gonzalez v. Rite Aid of N.Y., Inc.,* 199 F.Supp.2d 122, 129 (S.D.N.Y.2002). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. As the Court stated in *Anderson,* "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### 2. *Statutes of Limitation*

The parties agree that New York law applies to the claims of negligence and New Jersey law to the claims of securities

law violations.[9] "It has long been established as a matter of federal law that state statutes of limitations govern the timeliness of state law claims under federal diversity jurisdiction," as well as "the related questions of what events serve to commence an action and to toll the statute of limitations in such cases." *Personis v. Oiler,* 889 F.2d 424, 426 (2d Cir.1989) (citing *Walker v. Armco Steel Corp.,* 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)); *see GTFM, LLC. v. TKN Sales, Inc.,* 257 F.3d 235, 241 (2d Cir.2001).

### a. *Negligence Claims*

### i. *Accrual*

■ In New York, "an action to recover damages for an injury to property"—here, investment losses—must be commenced within three years from the time the cause of action accrues. N.Y. C.P.L.R. § 214(4) (McKinney 1998). A negligence claim accrues on the date of injury, that is, when the cause of action is "complete" and a plaintiff may plead all the required elements. *Brooklyn Union Gas Co. v. Hunter Turbo Corp.,* 241 A.D.2d 505, 660 N.Y.S.2d 877, 878 (2d Dep't 1997).

### ii. *Equitable Tolling*

■ The statute of limitations may be avoided by the doctrines of "equitable tolling" or "equitable estoppel." Although federal courts distinguish the two, New York courts use the terms interchangeably "to cover both the circumstances 'where the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'" *Pearl v. City of Long Beach,* 296 F.3d 76, 82 (2d Cir.2002) (quoting Joseph M. McLaughlin, Practice Commentaries, N.Y. C.P.L.R. C201:6, at 63 (McKinney 1990) and collecting cases). If fraud or fraudulent concealment is alleged, some courts apply the two-year discovery exception embodied in CPLR § 203(g) rather than § 214(4). *See Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 582 (S.D.N.Y.1999). The doctrines of equitable tolling and equitable estoppel apply to negligence causes of action where a defendant's fraudulent concealment prevents a plaintiff from timely filing a suit in negligence. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 446, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978); *see also Rizk v. Cohen,* 73 N.Y.2d 98, 106, 538 N.Y.S.2d 229, 535 N.E.2d 282 (1989); *Pearl,* 296 F.3d at 84.

■ "Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993) (citations and internal quotations omitted). To be within the rule, a plaintiff must show justifiable reliance on the misrepresentations as the cause of the delay in filing, and must exercise diligence in filing the action in a reasonable time after the facts giving rise to the estoppel have ceased to operate. *Id.; see Campbell v. Chabot,* 189 A.D.2d 746, 592 N.Y.S.2d 423, 424 (2d Dep't 1993).

■ In fact, "due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel." *Simcuski v. Saeli,* 44 N.Y.2d at 450, 406

---

**9.** The choice of law clause in the customer agreements provides that New York law applies to the negligence claims. The substantive provisions of the USL may not be waived and apply notwithstanding the choice of law clause. *See* N.J. Stat. Ann. § 49:3–71(i) (West 2002).

N.Y.S.2d 259, 377 N.E.2d 713. In other words, the question is when, as a matter of law, respondents can be charged with constructive knowledge of their claims.

### b. *The USL Claims*

#### i. *Accrual*

The USL provides for a two-year limitations period, running from the date of the "contract of sale *or the rendering of the investment advice*, or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action." N.J. Stat. Ann. § 49:3–71(g) (emphasis added).

Although each party quotes the emphasized language, none addresses its effect. The language was inserted by an amendment effective December 24, 1997. At the same time, the statute expanded the definition of "investment advice" to include advising a client to hold a security. *See* N.J. Stat. Ann. § 49:3–49(g)(1) (" 'Investment adviser' means: (i) any person who ... engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, selling or *holding* securities") (emphasized language added by amendment). The statute as amended clearly contemplates a period that begins to run after the "contract of sale," or the date of the relevant transaction.

■ The amended provisions have not been construed by New Jersey courts, and Blue Sky laws in other states do not contain similar language. *Cf.* Uniform Securities Act (1956) § 410 (providing that "[n]o person may sue under this section more than two years after the contract of sale"); *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 754 A.2d 1188, 1198 (2000) (noting Uniform Securities Act of 1956 was model for New Jersey USL). The parties have assumed that the amended statute applies; however, the transactions at issue occurred before the effective date of the amendment. New Jersey law concerning a prior amendment of the limitations provision suggests that application depends upon whether the claims were barred under the original statute at the time the statute was amended. In other words, if the claims were timely on December 24, 1997, under the original statute, then they would receive the benefit of the amended statute when later filed. *See Petruzzi v. Kobrin*, 241 N.J.Super. 439, 575 A.2d 80, 81 (1989) (noting that "[t]his amendment occurred before plaintiff's time to file under the original time period had run," and that "the timeliness of this filing is measured" by the amended period); *Bramblewood Investors, Ltd. v. C & G Assoc.*, 262 N.J.Super. 96, 619 A.2d 1332, 1335 (1992) (discussing *Petruzzi* ).

#### ii. *Delayed Accrual: Discovery Rule*

■ As a technical matter, equitable tolling is not available under the USL, as the USL has its own discovery rule which "mak[es] [equitable] tolling unnecessary." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000) (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)); *see* N.J. Stat. Ann. § 49:3–71(g) ("No person may bring an action ... more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action."); *see, e.g., Interlox Punch & Die Corp. v. Insilco Corp.*, 174 N.J.Super. 175, 415 A.2d 1208 (1980) (finding former § 49:3–71 reflected conscious legislative choice not to adopt a discovery rule); *Petruzzi*, 575 A.2d at 81 (noting that *Interlox* was superseded by statute and the limitation section amended to include a discovery rule effective April 9, 1986).

■ Under New Jersey law, "whenever a [party] claims a right to relief

from the bar of the statute of limitations by virtue of the so-called 'discovery' rule ... it is for the trial judge to decide [whether the party] is equitably entitled to the benefit ...." *Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563, 566–67 (1973). "The burden of proof rests upon the party claiming its indulgence; determinative factors for analysis may include the nature of the injury, availability of evidence and witnesses, time elapsed since the wrongdoing, prejudice to defendant, and whether the delay has been in any way intentional or deliberate." *Petruzzi*, 575 A.2d at 82. The Supreme Court of New Jersey has reiterated the balancing the rule requires:

> Because the discovery rule, at its root, is a rule of equity, [a court] must consider elements of fairness pertaining to all parties, not just to those asserting the benefits of the rule. 'After all, statutes of limitations are statutes of repose and the principal consideration underlying their enactment is one of fairness to the defendant.... It is not every belated discovery that will justify an application of the rule lifting the bar of the limitations statute. The interplay of the conflicting interests of the competing parties must be considered.'

*Lapka v. Porter Hayden Co.*, 162 N.J. 545, 745 A.2d 525, 532 (2000) (quoting *Lopez*, 300 A.2d at 567).

■ Under the USL discovery rule, "the timeliness of a filing is measured from the date a cause of action became known." *Bramblewood Investors, Ltd.*, 619 A.2d at 1335. The standard is not actual knowledge. "Once the party has a reasonable basis for believing he or she has a claim, the justification for the discovery rule ceases. There is no equitable reason to toll the statute of limitations for a party who reasonably should know that a claim exists." *Prudential Ins. Co. of Am. v. United States Gypsum Co.*, 828 F.Supp.

287, 298 (D.N.J.1993) (applying New Jersey law regarding discovery rule).

■ The parties have cited little pertinent law of New Jersey regarding the discovery rule in the securities context. There is nothing to suggest, however, that the rule in New Jersey differs from that under federal common law, for New Jersey courts, like the courts of many other states, look to federal securities law in applying their statutes. "Federal securities law concepts are to be used to define liability under the New Jersey statute." *Northwestern Nat'l Ins. Co. v. Alberts*, 769 F.Supp. 498, 509 (S.D.N.Y.1991) (citations omitted); *Riggs v. Schappell*, 939 F.Supp. 321, 324 n. 2 (D.N.J.1996); *Abrams v. Ohio Cas. Ins. Co.*, 322 N.J.Super. 330, 731 A.2d 48, 51 (1999) ("Federal securities law concepts are used to define 'control person' under the New Jersey statute.") (citation omitted).

■ As a result, in addition to state law, it is appropriate to draw upon the extensive federal common law regarding the discovery rule. Federal law requires a two-part inquiry. "[F]irst, whether the plaintiffs received information sufficient to alert a reasonable person to the probability that they had been misled, that is, whether the plaintiffs were on inquiry notice; and second, whether the plaintiffs responded to such notice with reasonable diligence." *Butala v. Agashiwala*, 916 F.Supp. 314, 318 (S.D.N.Y.1996).

■ In this matter, analysis under the discovery rule is functionally the equivalent of that under the equitable tolling doctrine. As the Second Circuit has observed, the discovery rule and the doctrine of equitable tolling are "similarly limited" by a plaintiff's obligation to exercise reasonable care and diligence. *Dodds*, 12 F.3d at 350.

## B. *Application*

First, I consider the negligence claims: which claims sound in negligence; when the claims accrued; and whether they are barred by the three-year statute of limitations. Second, I address the USL claims: whether the claims are timely, measured from the date of the "transactions"; and whether respondents may rely on the recent amendment to the USL and, if so, what effect it has on the statute of limitations analysis. Third, addressing both the negligence and USL claims, I consider the issues raised by the discovery rule and equitable tolling doctrines. I conclude that the claims are barred because respondents knew or should have known of their existence well before the applicable limitations periods expired. Fourth, I briefly discuss Chester's separate petition seeking to stay all of respondents' claims.

### 1. *Negligence*

### a. *Claims "Sounding in Negligence"*

The parties do not agree which claims sound in negligence. The Statement of Claim is comprehensive, alleging at least eighteen types of violations. The petition asks for a stay of "any claims sounding in negligence" or brought under the USL. (Pet. ¶ 6; *see also* Notice of Pet. at 1). Respondents construe the petition as seek-

ing to stay "only [two] of the many claims." (Resp't Opp. Mem. at 1 n. 1). This is not correct, as the petition is broadly worded to include "any" or all of them, and petitioners have expressly argued that the claim of failure to supervise Jedrlinic sounds in negligence.

### i. *Failure to Supervise*

▬▬▬ As with many of the eighteen claims put forward in the Statement of Claim, "failure to supervise" may refer to a violation of securities laws based upon fraud, or a technical violation sounding in negligence.[10] In contrast to a pleading in federal court, a statement of claim under NASD rules need only "specify the relevant facts and the remedies sought." NASD Code of Arbitration Procedure § 10134. The federal securities laws authorize the SEC to sanction broker-dealers and supervisors for "failure to supervise" personnel who engage in prohibited conduct, unless the firm and supervisors acted reasonably in discharging their duties and obligations under a system of procedures reasonably designed to prevent and detect violations. Securities Exchange Act of 1934, §§ 15(b)(6)(A)(i), 15(b)(4)(E), 15 U.S.C. 78o(b)(6)(A)(i), 78o(b)(4)(E). Technically, a claim of "failure to supervise" refers to SEC enforcement practice. NASD

---

**10.** For example, several claims relate to "unsuitability," which under federal law may only be pled as a violation of federal anti-fraud provisions. Federal law requires plaintiffs to show "(1) an investment was unsuited to plaintiffs' needs; (2) the broker knew or reasonably believed the investment was unsuitable; yet (3) the broker recommended the investment anyway." *Eickhorst v. E.F. Hutton Group, Inc.*, 763 F.Supp. 1196, 1200 (S.D.N.Y.1990). Unsuitability cannot be shown by negligence alone, and thus, if federal law were to apply, respondents' claims would be deemed "[a]nalytically ... a subset of the ordinary § 10(b) fraud claim," which the respondents have withdrawn. *Brown v.*

*E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir.1993). Under the analogous USL, respondents must also show scienter. N.J. Stat. Ann. 49:3–71(b)(1) ("[T]he person who bought the security or received the investment advice shall sustain the burden of proof that the seller or giver of investment advice knew of the untruth or omission and intended to deceive the buyer ...."). Nonetheless, respondents may press these claims as violations of NASD rules, which respondents allege constitute a breach of contract. Such claims would be subject to a six-year statute of limitations under state law, and are not subject to this stay petition.

Conduct Rule 3010(a) imposes the same duty on member firms to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the rules of the NASD."

It is not clear whether the Statement of Claim alleges failure to supervise as it is understood under federal law, or NASD rules. To the extent the claim refers to "negligent supervision," based upon common law negligence, the claim must be filed within three years after injury under New York law. This ruling will not, however, preclude respondents from asserting other claims, such as breach of contract, that are based upon a negligence theory, such as a failure to meet a contractual obligation because of negligent conduct.

### ii. *Respondeat Superior*

■ The Statement of Claim also alleges that Coleman is liable pursuant to the doctrine of respondeat superior for Jedrlinic's "wrongful conduct" and "misconduct," in addition to failing to properly supervise him. (Statement of Claim at 19–20). To the extent that Jedrlinic's misconduct is alleged to be negligence, this ruling applies and will control whether respondents may press those claims in arbitration. To the extent Jedrlinic or Coleman have acted fraudulently under the common law, or violated a contractual duty, such claims are unaffected.

### b. *Accrual of Negligence Claims*

■ In New York, a claim of injury to property due to negligence accrues on the date of injury. Here, respondents were injured on the dates of the various transactions that Jedrlinic facilitated. Respon-

dents do not cite any evidence of losses, nor do they suggest that they were not injured until the securities lost value. *See Butala v. Agashiwala,* 916 F.Supp. 314, 317 (S.D.N.Y.1996) (rejecting argument that claim did not accrue until damages "crystallized"). In fact, the Statement of Claim does not allege a particular time when losses occurred, except to state that "[t]hey are all worthless or virtually worthless today." (Statement of Claim at 6). Respondents were injured as of the dates of purchase—May 1994 through March 1995—when they received shares in private, start-up companies that were risky and illiquid instead of investments that were safe and secure. (Giaquinto Decl. at ¶ 4).

### c. *Negligence Claims are Barred*

■ Respondents commenced their arbitration proceeding on November 16, 1999. Respondents maintain that Coleman is liable by respondeat superior for Jedrlinic's misconduct, and directly for failing to adequately supervise him, such as by "negligently fail[ing] to uncover Jedrlinic's *un*registered investment advisory activities." (Statement of Claim at 11).[11]

■ Coleman argues simply that Jedrlinic left its employ in September 1996, and his departure bars any claim of vicarious liability or negligent supervision beyond September 1999. I agree. It is black letter law that respondeat superior only holds an employer to answer for the acts of an employee performed *within the scope of the employment. See, e.g., Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 996–97 (2d Cir.1991) (noting apparent authority terminates when the third person has notice of the termination of the agent's actual authority, because there can

---

11. Respondents specifically allege that Chester was in part responsible for this supervi-

sion as a principal of Coleman. Assuming this to be true, this claim is also not timely.

be no "reasonable belief [in an agent's apparent authority]" when there is "reason to know that the principal has revoked, or that the agent has renounced the authority, or that such time has elapsed or such events have happened after the authorization as to require the reasonable inference that the agent's authority has terminated") (quoting Restatement (Second) of Agency § 125 cmt. (b) (1958)); *Karibian v. Columbia University*, 14 F.3d 773, 780 (2d Cir. 1994) (citing Restatement (Second) of Agency §§ 219(1) & (2)(d)).

Here, the relevant employment ended in September 1996, when Jedrlinic moved to another brokerage firm. Respondents learned of the change in Jedrlinic's employment and shortly thereafter transferred their accounts. Put another way, respondents present no evidence to show that Jedrlinic acted toward them as Coleman's agent—actual or apparent—at any time after September 1996.

These undisputed facts also bar any claim of negligent supervision. While Coleman would be liable for failing to properly supervise Jedrlinic before September 1996, it owed no such duty to supervise Jedrlinic—as an investment advisor or broker—when Jedrlinic was employed with J. Robbins, Inc. after that time.

▉▉▉ It is true that Jedrlinic remained a board member of Coleman until October 1996, and a part owner until October 1997. Cryptically, respondents argue that this, without more, raises a question of fact about the control of the company, and its supervision of Jedrlinic. Respondents do not cite a single specific fact, however, that relates to Jedrlinic's activity as an owner or a director and how Jedrlinic, within the scope of this employment, injured respondents. *See, e.g., Raschel v. Rish*, 110 A.D.2d 1067, 488 N.Y.S.2d 923, 925 (4th Dep't 1985) ("Although Dr. Rish

was a part owner of defendant private proprietary hospital and served as president of its board of directors and as chief of plastic surgery, there is no evidence that he was an agent or employee of the hospital."). All of the allegations of the Statement of Claim concern Jedrlinic's recommendations as a registered representative or investment advisor, not as an owner of Coleman. "[A] broker can have duties to investors only if they are doing business with them." *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97 CIV. 4978(LMM), 2002 WL 88226, at *12 (S.D.N.Y. Jan. 23, 2002) (citing *Kolbeck v. LIT Am., Inc.*, 923 F.Supp. 557, 572 (S.D.N.Y.1996) ("Securities brokers do not owe a general duty of care or disclosure to the public simply because they are market professionals. A duty of care arises only when the broker does business with the plaintiff. Then, the duty of the broker is to attend to the plaintiff's business with due care.") (citation omitted)).

▉▉▉ Instead, respondents note parenthetically that Jedrlinic's ownership might justify "reverse veil piercing," referring to the doctrine that holds a corporate entity liable for the acts of its shareholders. This argument is meritless. First, the doctrine is not available in the negligence context. Under New York law, a party seeking reverse veil piercing must show "that the owner exercised complete domination over the corporation with respect to the transaction at issue." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997). No facts to support a finding of domination are alleged, nor facts that "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Id.* Moreover, Coleman as an entity had no contact with the respondents after Jedrlinic left more than three years before the Statement of Claim was filed. There-

fore, even if Coleman was dominated by Jedrlinic, that domination ceased to relate to the "transaction at issue" when Jedrlinic—and respondents—switched to another brokerage firm.

Coleman's vicarious liability for Jedrlinic's negligence or its own negligence in failing to supervise him ended with Jedrlinic's departure. Thus, respondents' claims against Coleman could not have accrued after that time, approximately October 22, 1996, the date Jedrlinic wrote to Viola informing her he had left Coleman, or at the latest November 7, 1996, the date respondents replied to Jedrlinic authorizing him to transfer their accounts. (Goodman Aff. Ex. K, Letter from Jedrlinic, J. Robbins, Inc. to Viola Giaquinto of 10/22/96; Viola Giaquinto Dep. at 32). Here, unless respondents can take advantage of the equitable tolling doctrines, any claims of negligence were untimely when the Statement of Claim was filed on November 16, 1999.

### 2. *The USL*

The USL contains a two-part limitations provision. Subject to the discovery rule, claims must be filed within two years of the transaction or investment advice. I discuss each aspect in turn.

#### a. *Date of the Transaction*

If respondents' state securities claims accrued at the time of the "contract of sale," they are barred. The latest securities transaction at issue here occurred in March 1995, and respondents' claim was not filed until November 1999. Viewing the evidence in the light most favorable to respondents, I will infer that Jedrlinic's loan from Kathleen concerned "securities," inasmuch as Jedrlinic advised her to invest money from her IRA account, where it may have been invested in securities, and "invest" it with him, personally, rather

than in other securities. This $35,000 transaction occurred in November 1996 although the promissory note from Jedrlinic was apparently provided in February 1997. (Nancy Giaquinto–Parker Dep. at 102–03). This additional period does not help respondents, as Jedrlinic had already left Coleman by this time, and the claims were still untimely when filed in November 1999.

#### b. *Rendering of the Investment Advice*

As a preliminary matter, I must determine whether the most recently amended statute of limitations applies to respondents' claims, even though most of the conduct at issue is alleged to have occurred before the amendment. Effective December 24, 1997, the amendment added language that a claim may accrue from the time of the investment advice, which is defined as advising to "hold" as well as to "buy." N.J. Stat. Ann. §§ § 49:3–71(g) & 49:3–49(g)(1). The original limitations period ran from the date of the transaction, or from discovery of the fraud.

For the purposes of this motion, I will apply the amended statute to the claims. As I discuss below, I do not conclude, as a matter of law, that respondents should have discovered the securities fraud as early as December 23, 1995. Therefore, the claims would have been timely (or respondents have at least raised a question of fact as to their timeliness) if filed on December 23, 1997. Thus, the timeliness of respondents' claims will be judged based upon the amended statute. This determination attaches some new significance to conduct that occurred before the amendment. Nonetheless, as respondents' claims would have been viable if filed as of the date of the amendment, the amendment does not have the effect of reviving stale claims. Moreover, "applying

a new or amended statute of limitations to bar a cause of action filed after its enactment, but arising out of events that predate its enactment, generally is not a retroactive application of the statute" as the conduct regulated by the changed statute is the filing of the complaint itself. *Vernon v. Cassadaga Valley Cent. School Dist.*, 49 F.3d 886, 889 (2d Cir.1995) (citations omitted).

 If the claims are deemed to accrue from the "rendering of the investment advice," they are still barred. Viewing the evidence in the light most favorable to respondents, I construe their meeting with Jedrlinic in the fall of 1997 as the rendering of investment advice to retain their shares of the companies he recommended. The record is not clear on this point, but Jedrlinic did advise that they hold their shares of Golf–Tech, for example, in 1994 and 1995, because "he thought it was going to go up to 8. And at that time, he would advise us to sell half and keep" half. (Nancy Giaquinto–Parker Dep. at 105 ("Did he ever make any similar recommendation regarding Jett–Aire? A. No. I don't remember. Q. [Hometown?] A. No.")). On the other hand, Jedrlinic may never have actually recommended "holding" the shares because there was actually no other choice: "I think that, at that point, we couldn't sell them yet" because they were not public. (*Id.* at 106).

In any event, even assuming that from time to time Jedrlinic advised respondents to hold their shares, respondents have not come forward with any evidence that he did so after November 16, 1997. The final meeting respondents cite "most likely" occurred in September or October of 1997. (Viola Giaquinto Dep. at 29; *see* Viola Giaquinto Decl. Ex. C, Sept. 30, 1997 Portfolio Appraisal (Financial Partners Ltd.)).

 More significantly for purposes of this case, by the fall of 1996, Jedrlinic was no longer acting on behalf of Coleman, as respondents were informed in October 1996. Even assuming Jedrlinic rendered investment advice to respondents by implicitly advising them to hold their securities as late as 1998, he was no longer acting for petitioners Coleman, Yorke, or Chester. Petitioners cannot be charged with "control person" liability after September 1996. *See, e.g., Abrams,* 731 A.2d at 51–52 (applying federal law to define liability under New Jersey statute, noting requirement of "active management" or "power over management or policies" and quoting SEC definition in 17 C.F.R. § 230.405 including "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise"). The text of the New Jersey statute provides: "Every person who directly or indirectly controls" a seller or investment advisor who commits securities fraud is jointly liable, subject to an affirmative defense that "he did not know, and in the exercise of reasonable care could not have known" of the fraud. N.J. Stat. Ann. § 49:3–71(d). Respondents have not presented any evidence that Coleman, Yorke, or Chester "indirectly" controlled Jedrlinic after his departure from Coleman.

Taking this argument further, respondents fail to raise any factual issue that Jedrlinic was somehow acting as Coleman's agent even after he left its service as a broker. Without more, Jedrlinic's continued part-ownership of Coleman is not sufficient. After all, as discussed earlier, the issue is Coleman's responsibility for Jedrlinic, not the reverse. Jedrlinic and Coleman may have had some identity of interest, as each owned shares in the same companies Jedrlinic recommended to respondents, and those shares were given to them to promote the stock. Respondents

do not allege or cite any evidence, however, that this shared interest alone is sufficient to hold Coleman responsible for Jedrlinic's activities after he left its employ.

### 3. *The Discovery Rule and Equitable Tolling*

Respondents seek to rely on both the discovery rule and the equitable tolling doctrines, and for each the analysis is the same: a plaintiff who has actually or constructively discovered a wrong no longer merits equitable tolling. Here, I conclude that respondents may not receive the benefit of these doctrines because, as a matter of law, respondents knew or should have known of the misconduct about which they complain well before they filed their arbitration claim.

The gravamen of respondents' claims—which I accept as true for purposes of this motion—is that Jedrlinic misrepresented the fundamental nature of their investments, that he represented they were "safe investments in solid companies" that would soon appreciate because they were "going public" very soon. Jedrlinic did not inform them that they could not sell the stocks after purchase, nor that the investments were inherently risky, nor, finally, that Jedrlinic and Coleman received some of the same stocks in exchange for promoting them.

First, I discuss the reasonable investor test and conclude that respondents failed to act with diligence after a duty to inquire arose. I proceed to discuss the knowledge any reasonable fact-finder would impute to respondents. This includes, first, that respondents understood initially that they were not investing in public companies, and were aware that they remained nonpublic, contrary to Jedrlinic's promises, long before they filed their claims. Second, a reasonable fact-finder could only find that respondents were aware that their investments were not liquid long before they filed their claims, as their complaints to Jedrlinic demonstrate. Third, I conclude that Jedrlinic's efforts to conceal the fraud were not successful.

### a. *The Reasonable Investor and Respondents' Lack of Diligence*

It is well settled that a plaintiff in a federal securities case will be deemed to have discovered securities fraud for purposes of triggering the statute of limitations "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds*, 12 F.3d 346, 350 (2d Cir.1993) (citations omitted). The test is an objective one, and "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.* Such circumstances are often analogized to "storm warnings." *Id.* The date of "discovery" under this inquiry notice standard is not actually the date that the duty of inquiry arises; it is the date that the plaintiff, having been put on inquiry notice, "in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000).

Here, a reasonable trier of fact could only conclude that respondents had such warnings as month after month passed and the companies Jedrlinic recommended were still not public. "After 'storm warnings' appear, plaintiffs must exhibit reasonable diligence investigating the probability that they have been defrauded." *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F.Supp.2d 216, 251 (E.D.N.Y.2002) (citations omitted). "A reasonable investor would have had ample reason to investi-

gate the status of an investment for which so much of what had been promised had not come true." *Butala*, 916 F.Supp. at 318 (collecting cases finding inquiry notice when available information contradicts promises and predictions).

"[F]or statute of limitations purposes, the issue is not whether [respondents were] given inadequate information about the advisability of investments in multiple limited partnerships"—here, I have assumed that Jedrlinic gave inadequate information—"but whether [respondents] had constructive notice of facts sufficient to create a duty to inquire further into that matter." *Dodds*, 12 F.3d at 351; *see Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1410 (S.D.N.Y.1996) ("Where a company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered.").

I conclude that, as a matter of law, here a reasonable investor of ordinary intelligence would have soon learned of the probability of the fraud alleged. Thus, well before the fall of 1996, respondents had "constructive notice that [they] had not been sold investments of the type [they] sought." *Dodds*, 12 F.3d at 351.

Respondents could have discovered the facts underlying the gist of their complaint with virtually *any* diligence whatsoever, from consulting any source other than Jedrlinic for basic investment information. The fact that an investment in *any* non-public company is riskier and less liquid than similar investments in publicly traded companies is easily obtainable public knowledge. *See, e.g., In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F.Supp.2d at 251 (concluding that a "reasonable investor of ordinary intelligence conducting a reasonably diligent investigation could be expected" to learn the fact that small investment banks hire clearing brokers, because such information is "public knowledge easily obtained by anyone researching small investment banks").

Respondents' deposition testimony, which at times conflicts with their own declarations, shows an absence of diligence. Nancy, for example, "might have" received Jett Aire financial information, and "it might have just gotten in the pile." (Nancy Giaquinto–Parker Dep. at 94, 100 ("It [April 1996 letter from Jedrlinic to Jett Aire shareholders] might be one that just got put on the pile. I had many piles."); *id.* at 95 ("It depended on the day and it was rare that I would ever get the chance to read everything that came through the mail so, no, I did not make a practice to read everything that came."); *id.* at 24 ("I had approximately ten bank statements that were coming to me at one time, so I honestly did not review every single statement. Sometimes it would just sit on my desk and I would just file it.")). Similarly, it was her regular practice not to read documents sent to her by Jedrlinic, but simply to sign the signature pages. (*Id.* at 37–38).

■ Respondents have not shown they were diligent in the face of these warnings; rather, they have shown the contrary, conceding that they failed to read some of the documents that Jedrlinic provided and that they even signed documents without reading them or with pages missing. The only evidence respondents submit that might be construed as evidence of diligence was their regular contact with Jedrlinic and attendance and complaints at their meetings with him. This does not suffice. For example, information about Golf–Tech that would have informed respondents about the nature of their investment was readily available in public filings with the SEC. I take judicial notice that, according to the SEC EDGAR database, Golf–Tech filed a Form 8–K with the SEC on May 22, 1996;

attached as an exhibit was a stock subscription agreement that included basic warnings such as "INVESTMENT IN THESE SECURITIES INVOLVES A HIGH DEGREE OF RISK." Golf Technology Holding, Inc. Form 8–K, Ex. 10.1, filed May 22, 1996. This information was public and easily obtainable.

*Dodds* is instructive. There, the plaintiff claimed that a broker, to increase commissions, "made material false statements and omissions inducing her to invest in securities . . . that were unsuitable for her because they were too risky and illiquid." *Dodds*, 12 F.3d at 350. Dodds was charged with inquiry notice, however, because she received prospectuses and other information disclosing the risks of her investments, and was charged with notice even though she did not read the materials. *Id.* at 351 (quoting *DeBruyne v. Equitable Life Assur. Soc. of the U.S.*, 920 F.2d 457, 466 n. 18 (7th Cir.1990) that plaintiff "cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put [her] on inquiry notice").

▇▇ Although the rule may be harsh when applied to unsophisticated investors, "a reasonable investor must be deemed to have some understanding of diversification and some independent view as to how much risk she is willing to undertake." *Dodds*, 12 F.3d at 351. Further, a reasonable investor exercises "reasonable diligence in overseeing his investments." *Birotte v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 468 F.Supp. 1172, 1180, 1186 (D.N.J.1979) (finding plaintiff's failure to read documents received meant no discovery rule tolling, even if one existed under the USL at the time).

In *Dodds*, the plaintiff was not entitled to continue to "rely on misleading oral statements" in the face of "offering materials contradict[ing] the oral assurances."

12 F.3d at 351. Here, I conclude that the same was true for respondents, who were not entitled to rely indefinitely on Jedrlinic's assurances in the face of a combination of undisputed factors. These included the excessive delay in the promised public offering; an apparent initial understanding that the investments were comprised of private, non-public corporations; receipt of offering materials for Jett Aire and Hometown in April 1994; public availability of offering materials for Golf–Tech as early as May 1996; and respondents' dissatisfaction with Jedrlinic and their illiquid investments that they expressed as early as September 1995. As respondents have failed to meet their burden to show "they exercised due diligence and reasonable care," *Zola v. Gordon*, 685 F.Supp. 354, 365 (S.D.N.Y.1988), they are not entitled to any equitable tolling.

**b. *Respondents Knew the Companies Were Private***

The record shows that respondents understood initially that they were investing in non-public companies. Respondents may not have appreciated the risks of such investments, and the investments may not have been suitable for them. Nonetheless, there is no other explanation for respondents' attentive expectation that the companies would soon be "going public" but to conclude that they knew they were not public when they invested in them.

Viola testified at her deposition that "she always takes notes." (Viola Giaquinto Dep. at 11). For example, during the meeting with Jedrlinic around September 30, 1995, Viola's notes show that she was aware that Jett Aire and Hometown were not yet public. The notes also reflect her understanding about Jedrlinic's recommendations, as she recorded the prices Jedrlinic predicted in some detail. (Goodman Aff. Ex. I, Sept. 30, 1995 Portfolio Appraisal (Coleman)). At the top of the

Portfolio Appraisal from this meeting, Viola wrote "Goal is more liquidity in portfolio," a topic she discussed with Jedrlinic, as respondents grew concerned over the delay in "going public" and their desire for greater liquidity. (Viola Giaquinto Dep. at 27; Goodman Aff. Ex. I, Sept. 30, 1995 Portfolio Appraisal (Coleman)). The meeting occurred six months after the last of the family's investments in these companies, and more than sixteen months from the first.

### c. *Respondents Knew Their Investments Were Illiquid and Subject to Risk*

Respondents reiterated their liquidity concerns to Jedrlinic in the meeting one year later, in October 1996. By this date, it is indisputable that respondents should also have been aware that their investments were subject to some risk. That is the certainly the conclusion a reasonable investor would make when predictions made two and half years earlier had failed to materialize. Thus, by October 1996, respondents were aware of the two claims at the heart of their complaint about Jedrlinic, that their investments were neither liquid nor safe and secure.

 At the very least, at some time after Jedrlinic's 1994 prediction that the companies would be "going public" within ninety days, a duty to inquire arose. Certainly that duty arose by October 1996, when respondents "should have" known, in the exercise of due diligence, that Jedrlinic had misrepresented the fundamental nature of the investments he recommended. After all, "[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."

*Dodds*, 12 F.3d at 352. Thus, any negligence claims were barred after October 1999, and any USL claims after October 1998.

Jedrlinic's "portfolio appraisals" do not negate respondents' awareness that their investments were not liquid and were subject to risk. The record includes portfolio appraisals containing a column labeled "market value." These shares essentially had no market value, as they were not publicly traded. The appraisals affirmed Jedrlinic's assurances that the respondents' investments were secure—even though there was a delay in "going public," respondents' initial investments were apparently not losing value, although the price attributed to the one public stock, Golf–Tech, was volatile.

Respondents do not primarily allege, however, that the stocks lost value. They allege that the securities were not what Jedrlinic advised them they were. *Dodds*, 12 F.3d at 351 ("In fact, because the issue is the very suitability of the investments ... account statements and quarterly financial reports would not have substantially enhanced the relevant information available. The riskiest and most illiquid investment may perform well or may perform poorly. Actual performance will shed little light on its ex ante suitability for a given investor."). Jedrlinic's portfolio appraisals may have been misleading, but they do not change the fact that respondents were on notice that the investments they purchased were not what they thought they were.[12]

### 4. *Intervenor–Petitioner Chester*

Chester has filed a separate petition, and a separate motion for summary judg-

---

**12.** Respondents have presented evidence that at various times Jedrlinic received stock in the same companies he recommended to respondents, and that later he used that stock to gain an ownership interest in Coleman. This is not relevant here. For purposes of tolling the statute of limitations, I have assumed that Jedrlinic is a fiduciary; respondents' claim of a breach of that duty is not before the Court. Although the information may be considered

ment, asking that *all* claims against him be permanently stayed. He argues that the only possible claims against him "appear[ ]" to be supervisory liability, under either the New Jersey securities statute or for common law negligence. (Chester Mem. at 2).

■ Chester was a part owner, and either managing director or chairman of the board of Coleman until he resigned on January 16, 1996. (Chester Dep. at 50). When he resigned, he transferred all his shares in the ownership of Coleman to Jedrlinic in exchange for a consulting agreement and shares of stock, including Jett Aire and Golf–Tech. (Chester Dep. at 20). It is not disputed that respondents did not become aware of Chester's existence until the arbitration proceeding. (Nancy Giaquinto–Parker Dep. at 134–35). As discussed above, respondents' New Jersey securities claims are time-barred, and in any event Chester's "controlling person" liability for Jedrlinic's misconduct terminated before November 1997. Similarly, any claims of supervisory or derivative negligence against Chester could not have accrued after his departure from Coleman, and thus were barred after January 1999.

■ Chester seeks a stay of all claims against him, relief that exceeds that sought in the Coleman petition. Respondents do not respond to Chester's petition, and the Court therefore assumes that Chester is correct that the only claims that might be asserted against him are those that are at issue in Coleman's petition—negligence and violations of the New Jersey securities laws. Chester's only conceivable involvement in the claims is through his position as partner and manager at Coleman, which terminated in January 1996. Although

Chester apparently remained a shareholder of some of the same stocks as respondents, there are no facts to suggest further "control" or "involvement" with Jedrlinic or respondents, nor do respondents allege any direct fraud or other misconduct by Chester. For the reasons stated above, no reasonable finder of fact could conclude these claims are viable. In addition, respondents raise no factual issue concerning Chester's role in any of the other sundry claims of the arbitration statement, and do not otherwise appear to oppose Chester's petition. Thus, I grant the relief requested, and all claims against Chester are permanently stayed.

### CONCLUSION

For the foregoing reasons, the motions for summary judgment are granted. All claims sounding in negligence or asserting violations of the USL against petitioner Coleman and intervenor-petitioner Yorke are stayed permanently, as these claims are barred by the statute of limitations. Likewise, all claims in the arbitration proceeding against intervenor-petitioner Chester are stayed permanently. The temporary stay is lifted as to any other claims, as this ruling does not preclude respondents from asserting claims in the arbitration against Coleman or Yorke that do not sound in negligence or do not allege violations of the USL.

The Clerk of the Court shall enter judgment accordingly. The case shall be closed.

SO ORDERED.

---

material, and perhaps should have been disclosed to respondents, I have already assumed for purposes of this motion that the investments were not suitable for respondents, or that Jedrlinic otherwise committed

fraud upon the respondents as they have alleged in their Statement of Claim. Thus, the issue of Jedrlinic's and Coleman's ownership of the same stock recommended to respondents is not relevant.