Anthony V. DEMARCO, for himself and all others similarly situated, Plaintiffs,

v.

ROBERTSON STEPHENS INC., and Paul Johnson, Defendants.

No. 03 Civ. 590(GEL).

United States District Court, S.D. New York.

Jan. 9, 2004.

Marc I. Gross, Shaheen Rushd, John Balestriere, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, Joseph H. Weiss, Jack Zwick, Weiss & Yourman, New York, NY, and Brian P. Murray, Eric J. Belfi, Gregory B. Linkh, Rabin, Murray & Frank LLP, New York, NY, for plaintiffs.

Andrew J. Frackman, Jill G. Fieldstein, Brendan Dowd, O'Melveny & Meyers

LLP, New York, NY, for defendant Robertson Stephens, Inc.

Eric S. Goldstein, Matthew J. Gaul, Douglas M. Pravda, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for defendant Paul Johnson.

## OPINION AND ORDER

LYNCH, District Judge.

This case concerns allegations that the defendant investment bank and its equity research analyst engaged in a brazen scheme to defraud buyers of stock in the Corvis Corporation ("Corvis"), in violation of § 10(b) of the Exchange Act and federal insider trading laws, by engaging in a variation on a so-called "pump and dump" stock manipulation, in which holders of securities fraudulently inflate the securities' price in order to sell at an artificial profit. The proposed plaintiff class asserts that defendants manipulated the price of Corvis stock by disseminating research analyst reports advising investors to purchase the stock at a time when defendants actually believed the stock to be greatly overvalued. The purpose of the alleged scheme, according to plaintiffs, was to maintain a high price for the stock until defendants could sell the Corvis shares they themselves held.[1] Defendants move to dismiss all claims on the ground that plaintiff fails to state a cause of action for which relief may be granted. For the reasons that follow, the motion to dismiss will be granted with respect to the claims

alleging insider trading, and denied with respect to all other claims.[2]

## BACKGROUND

For purposes of this motion to dismiss, the facts alleged in the complaint must be accepted as true.

Defendant Robertson Stephens, Inc., ("Robertson Stephens" or "RS") is a firm previously active as a broker-dealer, which provided financial services including securities underwriting, investment banking and the publication of equity analysis. (Am.Compl.¶ 16). In the 1990s, Robertson Stephens created a number of limited partnerships that invested in companies prior to the initial public offerings of their stock. These limited partnerships included Bayview 99 I, Bayview 99 II, and Bayview Corvis (collectively, the "Bayview Partnerships"). (*Id.* ¶ 19.) In November 1999, upon the recommendation of defendant Paul Johnson, a managing director and senior equity analyst at Robertson Stephens covering the networking sector, the Bayview Partnerships purchased approximately five million dollars' worth of stock in Corvis, a manufacturer of optical networking equipment (*Id.* ¶¶ 20, 2.) Johnson invested his own personal funds in the Bayview Partnerships, and also invested in a separate venture capital fund that purchased Corvis shares. (*Id.* ¶ 21.) These Corvis shares were privately issued prior to the Corvis initial public offering ("pre-IPO shares"), and subject to a "lock-up"

1. The complaint alleges that defendants also hoped, to curry favor with Corvis in order to gain future investment banking business, but this allegation is barely referred to in the complaint or in plaintiffs' opposition to the motion to dismiss.

2. Plaintiffs have filed a largely superfluous omnibus supplemental motion to strike a Street.com article offered by defendants, correct the record as to the date of the decline in price of Corvis stock around the time of the

publication of the New York Times article mentioned in ¶ 37 of the Amended Complaint, and cite supplemental authority in the form of Judge Cote's decision in *In re Worldcom Inc., Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y.2003). The motion concerns minor points that have little if any effect on the resolution of the central issues raised in the motion to dismiss. The motion is denied as to striking the article, granted as to correcting the record, and granted as to proffering the supplemental authority.

restriction that prevented the purchasers from selling the stock for 180 days after the initial public offering. (*Id.* ¶ 22.)

After the initial public offering of Corvis stock on July 27, 2000, at $36 per share (*id.* ¶ 23), Robertson Stephens started publishing analyst research reports containing what purported to be the firm's opinion regarding the stock, including recommendations to investors based on that opinion. Plaintiffs claim that defendants' scheme to manipulate the price of Corvis stock by publishing false statements of opinion in RS research reports began with the very first RS research report, issued on August 22, 2000, which contained a "buy" recommendation. The closing price of Corvis stock that day was $90.81. (*Id.* ¶ 25–26.) The second RS report, issued on October 20, 2000, when the closing price was $67.13 (an increase from the day's opening price of $59.61), also contained a "buy" recommendation. (*Id.* ¶ 27.) The third RS report, issued on January 16, 2001, when the stock closed at $23.94, again contained recommended a "buy." (*Id.* ¶ 29.)

One week later, on January 23, 2001, the day before the expiration of the six-month lockup period preventing defendants from selling their pre-IPO stock, Johnson told a meeting of the Bayview investment committee that he would buy Corvis stock at $12 to $14 per share, effectively advising the internal committee against buying at the then-market price of approximately $24.50. (*Id.* ¶ 31.) On the following day, the first day defendants were permitted to sell their own Corvis stock, Johnson sold 6,550 of his personal 8,175 shares, and RS sold the shares it held through the Bayview Partnerships. The stock price closed that day at $23.06. (*Id.* ¶ 32.) On January 25, Corvis reported a loss of $89.7 million (*id.* ¶ 33), and on January 26, only three days after Johnson had told the Bayview partnerships that he believed Corvis stock was worth $12 to $14 per share, Robertson

Stephens published a fourth report recommending that investors buy the stock, even as the stock closed that day at $20.50. (*Id.* ¶ 34.) Three days later, Johnson sold additional personally-held Corvis shares, and the stock closed at $19.43. (*Id.* ¶ 36.) Robertson Stephens published its fifth, final report on Corvis stock on April 27, 2001, again recommending that investors purchase the stock. (*Id.* ¶ 38.)

None of the RS reports on Corvis stock informed investors that Johnson and Robertson Stephens had sold the bulk of their own Corvis holdings. However, on January 29, 2001, Johnson filed a Form 144 statement with the SEC disclosing his January 24 sale of 6,550 shares. On Sunday, May 27, 2001, the New York Times ran an article reporting that Johnson and other executives at Robertson Stephens had been selling Corvis stock while advising the public to purchase the stock. The article did not reveal that Johnson had advised the Bayview committee to sell its shares. (*Id.* ¶ 39.) Gretchen Morgenson, "Buy, They Say. But What Do They Do?; I.P.O. Conflicts Bedevil Analysts," New York Times, May 27, 2000, Sec. 3, p. 1. The price of Corvis stock dropped 16% between May 25 and May 30. (P. Mot. to Correct Record, 3–4.)

Plaintiffs brought suit on January 27, 2003, and on July 28, 2003, filed an amended complaint on behalf of all purchasers of Corvis stock between the date of the first RS analyst report (August 22, 2000), and the last day of trading before the New York Times article was published (May 25, 2001). The complaint alleges that defendants attempted to prop up the price of Corvis stock until they could sell their own pre-IPO shares by encouraging investors to buy Corvis stock even though defendants actually believed that stock to be overvalued. (Am Compl. ¶ 2.) Defendants counter that trading in Corvis stock was

always volatile, that the plaintiffs did not read or rely on the RS reports, and that the market's overall disenchantment with telecommunications stock was the intervening cause responsible for plaintiffs' losses.

## DISCUSSION

### I. Standard on a Motion to Dismiss

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991). While the Federal Rules of Civil Procedure generally require only notice pleading, where, as here, plaintiff alleges fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based."). "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive*

*Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

### II. Section 10(b) Claims

#### A. Legal Standard

The Securities Exchange Act protects investors by proscribing,

> in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Commission, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *see SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 847–48 (2d Cir.1968) (explaining that the SEC "promulgated [Rule 10b–5] pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934," by which Congress sought "to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges").

#### B. Heightened Pleading Requirements

■ For federal securities fraud claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, reinforces the heightened pleading standards that apply to all claims of fraud or mistake under Fed.R.Civ.P. 9(b). Under the PSLRA, complaints alleging securities fraud must, first, "specify

each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1)(B); and second, "with respect to each act or omission alleged . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2); *see Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). That state of mind is scienter, which means "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Kalnit,* 264 F.3d at 138 (same).

The Second Circuit has made clear, however, that the PSLRA " 'did not change the basic pleading standard for scienter in this circuit.' " *Id.,* quoting *Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000). Both before and after the PSLRA, the law required plaintiffs bringing claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, to allege scienter with particularity. *Id.; compare Novak,* 216 F.3d at 307 (emphasizing that securities fraud allegations must "give rise to a strong inference of fraudulent intent"), *with* 15 U.S.C. § 78u–4(b)(2) (codifying the PSLRA's requirement that securities fraud complaints "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]").

### C. *Application to this Case*

▮ To state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence*

*v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) quoting *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 161 (2d Cir.2000). *See In re WorldCom, Inc. Securities Litigation,* 294 F.Supp.2d 392 (S.D.N.Y.2003).

### 1. *Misrepresentation of Opinion*

▮ Defendants do not contest that the complaint specifically alleges a scheme where defendants knowingly and intentionally disseminated false statements of their opinion about the value of Corvis stock. It is well established that liability under § 10(b) can be predicated on statements of opinion, where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Plaintiffs allege that one week after Johnson and RS published a research report recommending that investors purchase Corvis stock at the then-price of $23.94, Johnson told the internal Bayview investment committee that he valued the Corvis stock at $12 to $14 per share, approximately half of the actual selling price on that day. The very next day, Johnson and RS acted on this opinion, selling the bulk of their holdings in Corvis. Only three days after Johnson expressed his actual opinion to company insiders, Robertson Stephens issued another research report advising investors to buy the stock, which closed that day at $20.50.

Defendants argue that plaintiffs fail to allege facts indicating that the research reports issued on days other than January 26 did not reflect defendants' truly-held opinions as of the day those reports were published. The argument is not well taken. The complaint clearly alleges that the research reports "did not reflect defendants' true beliefs" about Corvis stock. (Am. Compl. ¶¶ 26, 28; *see also id.* ¶ 30.)

Plaintiffs also set forth facts giving rise to a strong inference that the reports misrepresented defendants' true opinions. First, there can be little dispute, on the facts alleged in the complaint, that the January 16 and 26 reports contained a false statement of opinion. A one-week or three-day lag between public statements advising purchase and an internal statement essentially advising sale supports the inference that defendants actually believed the stock was overvalued on January 16 and 26, when they publicly recommended that investors purchase the stock. Not only did defendants not follow their own publicly disseminated advice to purchase Corvis stock, they did the opposite and unloaded the stock they had at the earliest opportunity. Second, the earlier reports were issued during the lock-up period, when defendants had motive to support a higher price for shares they eventually would be able to sell. Given this motive, the relatively short time span covered by the research reports, and the fact that at plaintiffs have specifically alleged facts from which a factfinder could easily conclude that the January 16 and 26 reports stated the opposite of defendants' true opinion, the circumstances permit an inference that the scheme started earlier and encompassed the other reports as well. The complaint is thus adequate to state a claim as to the falsehood of all the research reports, and the plaintiffs will therefore be permitted discovery as to all of them.[3]

### 2. *Materiality*

To the extent that defendants argue that the misrepresented opinions did not constitute material misrepresentations, that argument is unpersuasive. "[T]o be material, the information need not be such that a reasonable investor would necessari-

ly change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997), citing *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Robertson Stephens was in the business of speaking to the market about stock values, it chose to speak about Corvis, and it is entirely reasonable that investors would consider analyst recommendations as part of the "total mix" of information available when making purchases. The facts stated in the complaint, if proved, are thus amply sufficient to permit a reasonable factfinder to conclude that the misrepresentations were material.

### 3. *Scienter*

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit*, 264 F.3d at 138 (internal quotations omitted). To survive a motion to dismiss, a § 10(b) complaint must "allege facts that give rise to a strong inference of fraudulent intent" by alleging either "(a) ... facts to show that defendants had both motive and opportunity to commit fraud, or (b) ... facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995), quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994); *see also In re WorldCom*, 2003 WL 21219049, at *16–17.

Plaintiffs have alleged scienter under either standard. First, the complaint alleges that defendants had both motive to

---

**3.** Of course, a factfinder could also conclude that defendants' opinions changed between August 2000 and January 2001, and changed again before April. But that is a decision for the factfinder, based upon the evidence ultimately presented at trial.

commit fraud (because they sought to support a higher price for Corvis stock until they were permitted to sell their own shares), and opportunity to commit fraud (by using their research division to publish reports encouraging investors to purchase Corvis stock at a time when defendants privately believed the market overvalued the stock). Second, the complaint alleges facts about the opinion Johnson expressed at the January 23 Bayview meeting that constitute strong direct evidence that defendants consciously misrepresented their opinion about the true value of the Corvis stock in reports published shortly before and after the internal meeting. Therefore, the complaint sufficiently alleges scienter under either prong of the two part test described in *Acito.*

### 3. *Causation*

■ In order to state a claim under § 10(b),the complaint must allege that "plaintiff's reliance on defendant's action caused plaintiff injury." *Press v. Chem. Invest. Svces. Corp.,* 166 F.3d 529, 534 (2d Cir.1999) (internal quotations and punctuation omitted). This causation requirement has two elements: "a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (emphasis in original).

#### (a) *Transaction Causation*

■ In order to survive a motion to dismiss, a plaintiff must allege "that the violations in question caused the plaintiff to engage in the transaction in question." *Grace v. Rosenstock,* 228 F.3d 40, 45 (2d Cir.2000) (internal quotation and punctuation omitted). While plaintiffs here do not allege that they ever saw or read the RS research reports about Corvis stock before purchasing the stock, that is not fatal to their claim because plaintiffs' allegation of transaction causation relies on the so-called fraud-on the-market theory, "based on the hypothesis that, in an open and developed securities market the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–1161 (3d Cir.1986). This theory of transaction causation takes into account the difference between face-to-face negotiated transactions contemplated by traditional common-law fraud doctrines, and modern securities markets where multiple sellers and buyers engage in transactions at prices determined by an impersonal market, while remaining mutually anonymous. *See In re Worldcom Inc., Sec. Litig.,* 219 F.R.D. 267, 300 (S.D.N.Y.2003) (class certification decision).

■ *Basic* relaxes the requirement of direct reliance where plaintiffs allege that defendants have "disseminate[d] false information into the market on which a reasonable investor would rely." *In re Ames Dept. Stores, Inc., Stock Litig.,* 991 F.2d 953, 967 (2d Cir.1993). In such a case, individual investors are relieved of the burden of showing direct reliance on the fraudulent statement because it is assumed that in an efficient market, all public information is reflected in share price, including any misrepresentations concerning the value of the company or its stock, and "it is sufficient that [the investor] bases her transactions on the market trends or securities prices that are altered by the fraud." *In re Initial Public Offerings*

["IPO"] Sec. Litig., 241 F.Supp.2d 281, 375 (S.D.N.Y.2003). The ensuing presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff," because in that case "the basis for finding that the fraud had been transmitted through market price would be gone." Basic, 485 U.S. at 248, 108 S.Ct. 978.

Defendants argue that the complaint does not sufficiently allege transaction causation because the fraud-on-the-market theory applies only to misrepresentations by corporate insiders, and not to opinions published in analyst reports. (D.Mem.13–14.) However, defendants do not cite a single case holding or even suggesting that the fraud-on-the-market theory extends only to misrepresentations made by individuals presumed to possess inside knowledge. Nor do the economic principles underlying the doctrine support that assertion, since efficient market theory does not exclude non-insider information from the mix of information factored into share price.

An underwriter like Robertson Stephens that has a research department engaged in the business of analyzing companies in order to disseminate to the public information and opinions about specific securities clearly intends that the market take into account its recommendations to buy or sell such securities. It is axiomatic that prices in an open market reflect supply and demand, and it is disingenuous, to say the least, for defendants to now argue that their published purchase recommendations are somehow excluded from the information available to market actors when valuing securities.

The Court expresses no opinion as to the extent of influence those recommendations may or may not have in terms of pricing securities—that is a question of fact for trial. However, at least for pur-poses of this motion to dismiss, it is evident that plaintiff is entitled to present evidence to attempt to convince a factfinder to conclude that the opinion of analysts trained to research and review public information about companies carries significant weight in the market. While defendants argue that Robertson Stephens was merely one voice in a chorus of buy recommendations, it is certainly plausible that had RS chosen to sing out of tune by publicly uttering its true opinion about Corvis stock, the resulting disharmony would have prevented the artificial inflation of the stock price and saved at least some of plaintiffs' losses. Alternatively, had Robertson Stephens chosen not to sing at all, it is possible that the chorus of buy recommendations would have been that much more muted, likewise saving at least some of plaintiff's losses. In any case, the ultimate impact on share price of RS's decision to publish a false representation of opinion, rather than to publish its true opinion or remain silent, is an issue of fact for a jury to decide.

At least two other courts in this district have addressed a similar issue concerning the materiality of analyst reports to share price. Despite defendants' attempt to distinguish the holding in In re IPO Sec. Litig., Judge Scheindlin did find that one factor in the alleged scheme to defraud in that case was the underwriter defendants' issuance of fraudulent analyst research reports touting the subject stock, and that plaintiffs adequately pled transaction causation. 241 F.Supp.2d at 377–78. In a recent Worldcom decision, Judge Cote also found that the publicly available information concerning the issuer's stock, which was reflected in that stock price, "included . . . analyst reports." In re Worldcom, 219 F.R.D. at 300 (class certification decision).

Unable to prevail as a matter of law, defendants retreat to the facts, and argue first, that analyst reports do not move stock prices (D.Mem.15), and second, that even if some analysts' reports have such impact, Roberston Stephens' reports did not, since Robertson Stephens was simply one of many banks publishing buy ratings for Corvis stock during the period at issue (D.Mem.17).[4] Whatever factual merit these arguments may eventually turn out to have, they do not concern the sufficiency of the allegations in the complaint, but rather address whether those allegations are correct on the merits. It is not for the Court to decide, on a motion to dismiss, whether or to what extent the RS research reports artificially inflated the Corvis stock price, or-whether or to what extent the market functioned efficiently. These are issues of fact for trial. Accepting the facts in the complaint as true, plaintiffs have adequately pled transaction causation by alleging that fraudulent opinions published in the RS research reports distorted the Corvis share price set by the market, and that the plaintiffs relied on the integrity of that price when purchasing Corvis stock.

Finally, defendants offer a "truth-on-the-market" defense to counter the fraud-on-the-market reliance presumption, arguing that the potential conflicts of interest were known to the market, and thus already factored into the Corvis share price. Defendants essentially assert that there was no artificial price inflation because the misrepresentations were not material to price since conflicts of interest were already disclosed. Specifically, defendants point out (1) that Robertson Stephens repeatedly disclosed that it might own stock

in Corvis and provided investment banking services to Corvis; and (2) that the Corvis prospectus indicated that defendants owned pre-IPO Corvis shares. In addition, although defendants' papers do not explicitly make this point, plaintiffs address the possible claim that Johnson's Form 144 statements disclosing his sale of Corvis stock to the SEC could be used to support a truth-on-the-market defense. (P. Opp.17).

■ To establish the defense, defendants must show that the public received accurate, "corrective information" from an alternative source " 'with a degree of intensity and credibility-sufficient to counter-balance effectively any misleading impression created' by the alleged misstatements." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir.2000), quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989). As the Second Circuit has noted, "[t]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* Whether or not defendants' disclosures of potential conflicts stemming from their possible ownership of Corvis stock or their provision of investment banking services to Corvis meet the "intensity and credibility" standard is a question of fact and thus beyond the scope of the Court's purview on a 12(b)(6) motion.

Defendants additionally claim that "the market was ... aware ... of the allegedly conflicting roles of sell-side analysts" from extensive media commentary (D.Mem.19), and refer to the decision in *In re Merrill*

---

4. Defendants' related argument that plaintiffs fail to plead that the misrepresentations "moved the price of Corvis stock" (D.Mem.2) is without merit, since the complaint plainly alleges that "[a]s a result of the dissemination of the materially false and misleading information and/or failure to disclose material

facts ... the market price of Corvis securities was artificially inflated during the Class period." (Am.Compl.¶ 57.) Plaintiffs also allege that the price of Corvis stock took a further unexplained decline upon revelation of the fraud in the press. (*Id.* ¶ 40.)

*Lynch & Co. Research Reports Sec. Litig.,* 273 F.Supp.2d 351 (S.D.N.Y.) (non-client investors sue broker-dealer for issuing false analyst reports). Judge Pollack there found that failure to disclose alleged conflicts did not constitute fraud on the market in that case because numerous newspaper articles referenced in the complaint "evidence that the market was apprised of the very conflicts and ratings issues" raised in the complaint. 273 F.Supp.2d at 375. Unlike the case before Judge Pollack, defendants here are accused not merely of failing to disclose a potential conflict which may have affected the analysts' judgment, but of actively misleading the public by directly lying about their own true opinion of Corvis stock in order to prop up the stock price until defendants could unload their own shares.

It is hard to imagine that general concerns about analyst conflicts would have sufficiently apprised the market of this specific scheme to dupe investors into purchasing securities that defendants allegedly believed to be greatly overvalued so that defendants could sell their personal shares at an artificial profit. It is one thing to be aware that an analyst might have a conflict of interest that could cloud his judgment, and quite another to be aware that the analyst believes the exact opposite of what he is saying, and that he is saying it precisely in order to induce the unwary investor to buy the very stock the analyst is trying to unload before others realize, as he has, that the stock is wildly overvalued. Needless to say, whatever information Robertson Stephens or Johnson disclosed, and whatever the press revealed about potential conflicts, the truth about defendants' real views of Corvis was not a mat-

ter of public record during the period of the alleged scheme.[5] While defendants may be able to offer evidence to rebut the fraud-on-the-market presumption of plaintiffs' reliance after discovery, at this stage plaintiffs' allegations are sufficient to permit the case to go forward.

(b) *Loss Causation*

 The Second Circuit has "likened loss causation to the tort concept of proximate cause, because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). *But see AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 233 (2d Cir.2000) (noting that "the pertinent requirements of proximate cause in a statutory case are those intended by the legislature" and warning that courts not "overwork the analogy between proximate cause in common law negligence and proximate cause in federal securities law violations") (internal citations and punctuation omitted). If the loss was caused by an intervening event not related to the fraud, then the § 10(b) claim must fail. *Suez Equity,* 250 F.3d at 96.

 Essentially, defendants argue that plaintiffs fail to meet the loss causation requirement because the complaint must do more than allege that the misrepresentations caused a disparity between the transaction price and the actual value of the stock, it must allege that the loss is a direct consequence of the misrepresentation. Defendants correctly articulate the

---

**5.** Johnson's filing of a Form 144 does not alter this conclusion. Filing a relatively inaccessible form with a government agency disclosing that Johnson sold Corvis shares is not, at least as a matter of law, a corrective to publicly-disseminated analysts' reports. It is

a question of fact whether this "corrective information" lacked the "intensity and credibility" necessary to counteract defendants' deliberately falsified opinion, and a reasonable factfinder could easily conclude, on the facts alleged in the complaint, that it did not.

governing standards, but fail to properly apply those standards to this fraud-on-the-market case. It is true that where a plaintiff sufficiently alleges that a misrepresentation caused him to purchase a security, he still must demonstrate that the same misrepresentation was the cause of the loss. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir.2003) (an "allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement"). It is not enough to claim that the price was artificially inflated when plaintiffs purchased the stock, because if some event not related to the misrepresentation caused the loss, then there is no § 10(b) liability. To establish loss causation, in other words, plaintiffs "must also show that the misstatements were the reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994).

Some examples may clarify the distinction. If a buyer purchases stock in a company at a market price based at least in part on false analyst opinions, and then the company is unexpectedly nationalized at a price below market, the operational cause of the buyer's loss would be the action of the sovereign and not any decline in price resulting from the misrepresentation. The buyer would have no § 10(b) claim even if, under the fraud-on-the-market doctrine, she had relied on the misrepresentation when she purchased the stock at the market price. That would establish only transaction causation, not loss causation, because the nationalization was the cause of the loss and the nationalization was not a foreseeable consequence of the analyst's misrepresentation. In an actual example relied on by defendants (D.R. Mem.8), the defendants in *Gelt Funding* allegedly induced the plaintiff bank to lend them money by making false statements about their rent rolls. While the false statements may have caused the transactions, the Second Circuit ruled that loss causation had not been shown; among other reasons because the real cause of the bank's loss was a drastic collapse of the New York real estate market, which caused the loans to go into default and the collateral to decline in value. 27 F.3d at 772.

Defendants argue that plaintiffs' loss in this case was due to the general market downturn in telecommunications stock, and that this market downturn was not a foreseeable consequence of defendants' misrepresentations. (D.Mem.8.) Defendants thus construe the "bursting of the telecommunications stock bubble" as the intervening cause of plaintiffs' loss. That argument is not persuasive because plaintiffs' theory of the case is that these defendants deliberately participated in inflating the bubble in the first place by disseminating the very misrepresentations at issue. Thus, the publication of the intentionally false opinions that allegedly distorted the market price of Corvis stock contained the seeds of loss causation. Unless an intervening event were to occur first, the author of the false opinion will be appropriately held responsible when the market eventually corrects the artificially inflated price by bursting the bubble. Unlike the defendants in *Gelt Funding*, whose misrepresentation were unrelated to the market conditions that caused the real estate bubble first to inflate and then to burst, defendants here are alleged to have induced the purchase of Corvis stock by doing their best to pump up the very bubble that then predictably collapsed. Indeed, they are alleged to have known that the bubble was already, as to Corvis, in the process of deflating, even as they flogged the stock to less knowledgeable investors by blowing as much hot air as they could.

Defendants' argument that loss causation is not alleged because plaintiffs assert that the misrepresentations *increased* the Corvis stock price misses the point that the origins of loss causation reside precisely in that artificial price inflation. Defendants' seemingly contrary argument that plaintiffs fail to allege artificial price inflation because the price of Corvis stock was on a general *decline* during the class period is similarly besides the point. The fact of gradual price decline is not inconsistent with the theory that the price was artificially inflated, since the misrepresentations may well have buoyed a price that would otherwise have sunk much faster, thus raising the price at which plaintiffs purchased the stock. Plaintiffs' theory is supported by the fact that Corvis stock fell still further once the press broke the story of defendants' January 2002 actions. A factfinder could conclude that this drop supports the theory that earlier disclosure of defendants' true opinion would have in itself affected the price of Corvis stock.[6]

Defendants emphasize the difference between the scheme alleged in this case, and a traditional "pump-and-dump" scenario where the fraudsters are insiders who disseminate false information about their own company to inflate the stock price, then cause a price drop by unloading their own shares. (D.R. Mem.4–5.) Defendants argue that plaintiffs have not alleged loss causation because the fraud alleged here is not such a case—defendants are not Corvis insiders and plaintiffs do not allege that they controlled the market sufficiently to manipulate the price at will, nor that the rapid sell-off of defendants' shares caused the price drop. Defendants are correct that "pump and dump" is not a talisman,

and merely citing those words is not sufficient to allege loss causation. By the same token, however, the fact that the alleged fraud is *not* a classic "pump and dump," but rather a variation on that theme, does not in itself mean that plaintiffs fail to allege loss causation. The analogy to a pump-and-dump scheme is that defendants misused their status as market commentators to prop up the Corvis stock price until they could unload their own shares. When defendants chose to speak about Corvis, they hid their true opinion, which could have depressed the price, and lied with the intent to increase the demand for Corvis stock for their own gain. The impact of defendants' false opinions on share price is a question of fact for a jury to decide, regardless of the jargon used to describe the scheme.

Defendants' primary argument against finding loss causation here is that fraud-on-the-market theory should apply *only* to transaction causation, and never to loss causation under any circumstances. The Second Circuit has not addressed whether, in the context of a class action relying on a fraud-on-the-market theory, plaintiffs sufficiently plead loss causation by alleging that they purchased at an inflated price created by the misrepresentations, and the price declined as the market corrected the distortion. There is a division of authority on the subject. The Ninth Circuit has rejected defendants' position, holding in *Knapp v. Ernst & Whitney* that "[i]n a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation." 90 F.3d 1431, 1438 (9th Cir.1996). Other

---

**6.** Of course, a factfinder might also conclude that the decline was a normal fluctuation, or consistent with the general trend of decline in Corvis share prices during that period, or caused by some other event, or that the relatively small absolute decline in the already depressed price (rather than the percentage decline stressed by plaintiffs) indicates that RS's opinions were not so important. These are all matters for the factfinder on a fully-developed record.

circuits have also found that loss causation was adequately pled in fraud-on-the-market cases where defendants' misrepresentations led to an artificially altered stock price, which was followed by a market correction. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir.2000) ("where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement"); *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 619 (8th Cir.1991). Judges of this Court have also followed *Knapp. See In re IPO Sec. Litig.*, 241 F.Supp.2d at 377, n. 145 (Judge Scheindlin noting that "the second prong of the *Suez Equity* test essentially applies the fraud on the market theory to loss causation" and applying *Knapp* ); *Fellman v. Electro Optical Systems Corp.*, No. 98 Civ. 6403(LBS), 2000 WL 489713, at * 12 (S.D.N.Y. Apr.25, 2000) (Judge Sand applying *Knapp* ). Defendants find support for their position, however, in the Eleventh Circuit, and in Judge Pollack's recent decision in *Merrill Lynch. See Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir.1997) ("the fraud on the market theory, as articulated by the Supreme Court, is used to support a rebuttable presumption of reliance, not a presumption of causation"); *In re Merrill Lynch Sec. Litig.*, 273 F.Supp.2d at 365 (applying *Robbins* and reasoning that "[t]o permit plaintiffs to allege artificial inflation through the fraud on the market theory to satisfy loss causation would improperly conflate both the 'but for' transaction causation and the loss causation elements into one.")

As the hypothetical example of the nationalized issuer indicates, it is unlikely that loss causation could be adequately alleged in *every* fraud-on-the-market case that successfully pleads transaction causation because in cases where an unforeseeable intervening event causes the plaintiffs' loss, there is no causal nexus between the loss and the misrepresentation. However, as the Second Circuit was careful to point out in *Gelt Funding*, neither did the Court "mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate causation when the claim follows a market collapse." 27 F.3d at 772. On the facts in *this* case, the Court must conclude that plaintiffs have adequately alleged loss causation because the decline in stock price was a foreseeable consequence of defendants' fraudulent statements that allegedly inflated the price, because in an efficient market, revelation of the misrepresentations will lead inexorably to a price correction. On this motion to dismiss, the bursting of the *Corvis* stock bubble could reasonably be construed, at least in part, as the market's correction of an inflated stock price, pumped up in part by defendants' false statements about its opinions.[7]

---

**7.** The concerns expressed in the *Merrill Lynch* opinion that application of fraud-on-the-market theory to loss causation will open the floodgates and encourage strike suits against any and all market commentators, *In re Merrill Lynch*, 273 F.Supp.2d at 366, fn. 28, are not implicated in this case. Regardless of causation issues, plaintiffs bringing meritless suits against analysts will still have to allege particularized facts demonstrating intent to defraud. In this case, plaintiffs rely not on general allegations of undisclosed conflicts, but on particularized proof of direct misrep-

resentations of opinion for the specific purpose of propping up an already fading stock until defendants could unload their shares. Such conduct is hopefully rare; if it is not, a flood of lawsuits may be appropriate. Moreover, in this case there is evidence that disclosure of defendants' scheme caused a further decline in the price of Corvis stock, even after the overall bubble had burst. General concerns about meritless attacks on optimistic analysts cannot justly require dismissal of a suit in which genuine issues regarding loss causation are presented.

Thus, defendants' attempt to recast the foreseeable price decline of pumped up stock as an unforeseeable intervening market event is unpersuasive. While defendants may be able to show after discovery that an unforeseeable intervening event caused the stock price to decline, plaintiffs' complaint is sufficient to raise an issue of fact as to whether some part of their losses was proximately caused by defendants' deliberate fraud.

### III. *Insider Trading Claims against Johnson*

Count III of the complaint alleges a claim against Johnson for insider trading. Section 20A(a) of the 1934 Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action ... to any person who ... has purchased ... or sold ... securities of the same class." 15 U.S.C. § 78t–1(a). The section creates a private right of action to enforce the existing prohibition on insider trading under § 10(b) caselaw, and does not create a new definition of insider trading. Thus, in order to state a claim under this section, plaintiffs must properly plead an independent cause of action for insider trading under § 10(b) of the 1934 Act. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994). This plaintiffs have not done, and therefore the insider trading claim against Johnson must be dismissed.

Under the classic theory of insider trading liability, " § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Any corporate insider who trades on such non-public information violates his fiduciary duty to the shareholders of the corporation because he takes "unfair advantage of ... uninformed ... stockholders." *Id.* at 652, 117 S.Ct. 2199, citing *Chiarella v. United States*, 445 U.S. 222, 228–229, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Even the most nimble lawyer cannot adequately plead a cause of action under this theory on these facts. Johnson is not a Corvis insider, nor is there any allegation that he had received a tip as to any inside information from Corvis. Rather, Johnson is a Robertson Stephens insider, and had formed his opinion about Corvis stock apparently based on public information, and circulated that opinion among insiders at Robertson Stephens. Those insiders, including Johnson, then traded based on that opinion.

The Supreme Court has held that the "use of [inside] information [is] not a fraud under § 10(b) unless [the user is] subject to an affirmative duty to disclose it before trading." *Chiarella*, 445 U.S. at 231. Plaintiffs appear to argue that Johnson's use of his own opinion in deciding to purchase Corvis stock was insider trading because he violated a supposed fiduciary duty to the readers of Corvis research reports by failing to voice his true opinion. This theory is faulty. While Johnson had a duty not to publish a *false* account of his opinion once he decided to speak publicly about Corvis stock, that duty arose from the decision to speak, and the obligation not to speak falsely. Johnson had no fiduciary duty to Corvis shareholders, or to the public at large, or even, on the facts alleged, to readers of RS research reports, to disclose his opinion about a stock before trading on it. To the extent that his opinion is in any sense "inside information," Johnson is not prohibited from trading stock based on that opinion. Indeed, it is hard to imagine on what basis he would trade stock if not on his own opinion.

Plaintiffs appear to confuse the fraudulent misrepresentation scheme in Count I, in which defendants are alleged to have voiced one recommendation to the public and to have acted on the opposite private recommendation, with an insider trading claim. Had Johnson formulated his opinion about Corvis stock and then acted on it without publicly voicing any opinion at all, there would clearly be no insider trading violation. He is under no obligation to inform the market of every opinion he formulates. Publicly voicing a false opinion and acting on a private opinion may constitute a scheme to defraud or to manipulate stock prices, but it does not render that scheme an insider trading violation.

## IV. *Control Person Liability*

 Section 20(a) of the Exchange Act creates a cause of action against persons alleged to have controlled those engaged in the primary securities fraud. The section provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally . . . unless the controlling person acted in good faith . . ." 15 U.S.C. § 78t(a). " 'Controlling-person liability' is a separate inquiry from that of primary liability and provides an alternative basis of culpability." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77–78 (2d Cir.2001). If plaintiffs have adequately pleaded a § 10(b) claim, the primary violation element of a § 20(a) claim is sufficiently pled. *Id.*

As explained in the preceding section, plaintiffs fail to state cause of action for insider trading against Johnson. It is thus axiomatic that the claim for control person liability regarding allegations of insider trading must fail. However, to the extent that Count II alleges that Robertson Stephens controlled Johnson when he engaged the authorship of intentionally misleading analyst reports about Corvis stock

intended to artificially inflate the stock price, it states a claim for control person liability because, as explained above, plaintiffs have stated a claim for a stock manipulation scheme in violation of § 10(b).

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint is granted with respect to Count III, and with respect to Count II in regard to allegations of insider trading. The motion is denied with respect to Count I, and with respect to Count II in regard to allegations of a scheme to defraud or manipulate stock prices. Lead Plaintiff's omnibus motion is granted with respect to correcting the record and providing supplemental authority, and denied with respect to striking the article appended to defendants' reply memorandum.