## In re PRONETLINK SECURITIES LITIGATION.

No. 03 Civ. 2298(RO).

United States District Court, S.D. New York.

Dec. 8, 2005.

Kenneth J. Vianale, Vianale & Vianale LLP, for Plaintiffs.

Anne E. Beaumont, Paul J. Fishman, Friedman Kaplan Siler & Adelman, LLP, for Defendants Jean Pierre Collardeau.

Lawrence A. Steckman, Lester Schwab Katz & Dwyer, LLP, for Defendants Feldman Schreb & Co and Auguste Francis Vincent.

Brian D. Linder, Clayman & Rosenberg, for Defendant Glenn Zagoren.

Edward J. Boyle, Joseph L. Francoeur, Wilson Elser, Moskowitz, Edelman, & Dicker, LLP, for Defendant Grassi & Co.

*OPINION & ORDER*

OWEN, District Judge.

Class plaintiffs—allegedly injured stockholders—sue under § 10 of the Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, against the CEO, Jean Pierre Collardeau, and Executive Vice President, Glen Zagoren, of the now-defunct ProNet-Link Company ("PNL"), as well as its outside auditors and their putative successors in interest. Plaintiffs bring additional claims against the CEO and the EVP for violating Section 20(a) of the Exchange Act under a theory of control person liability, and against CEO Collardeau for violating Section 20A of the Exchange Act by engaging in insider trading. The Second Consolidated Amended Complaint ("the complaint") alleges that Collardeau and Zagoren engaged in a "pump and dump" scheme wherein they artificially inflated the value of PNL stock while secretly selling their shares to the public.[1] The complaint further alleges that defendant Feldman Sherb & Co.—the company's outside auditor—knew or recklessly disregarded repeated warnings that PNL would not be able to perform as they represented, and damages are sought against Sherb & Co. and Grassi & Co. as successors in interest to Feldman Sherb.[2] Presently before me are defendants' motions to dismiss the complaint.

PNL was formed in 1997 to facilitate international trade through various tools and services accessible through its website. Its primary assets were (1) its website, www.ProNetLink.com, marketed to the public as a resource for facilitating international business transactions among small and medium sized companies, and (2) PNL–TV, a facility for producing programming for the internet. PNL's initial public offering was not a success. Despite selling 7.5 million shares through private placements, it brought in only $150,000.[3] This inside placement of PNL stock was allegedly the first step in executing the pump and dump scheme—by placing company stock secretly within his personal control, Collardeau would be able to sell it quietly while continuing to pump the stock to the public.

In March 1998, Collardeau retained the services of defendant Glenn Zagoren, the president of Zagoren–Zozzora, Inc., a strategy and marketing company. Zago-

---

1. This conduct has already resulted in criminal proceedings against Collardeau and others. Collardeau pled guilty on August 16, 2004, to conspiring to defraud PNL's investors of over $20 Million and was sentenced to 50 months in prison.

2. PNL is not named as a defendant because it filed for bankruptcy protection in July 2001. *But see infra.*

3. Even this amount is alleged to have been inflated since the complaint alleges that a substantial portion of the common stock sold through these private placements were in fact issued to alter egos of Collardeau, his family, and one Philippe Hababou (a non-party to this action).

ren was appointed a director of the company in May 1998.

The alleged class period began on August 26, 1998, when the company announced in a press release its first "live" broadcast to increase the level of interest in the company's internet broadcast operations, and to increase the price of the company's stock. The complaint alleges that Zagoren and Collardeau repeatedly misled the public through false public filings, press releases, shareholder meetings, and postings on the internet. Most of the false claims were made online, frequently by posting messages on business-oriented websites and by directed internet advertising programs. One such claim was made on the Silicon Investor website, where PNL "project[ed] 40,000 members by the end of the year at $360 per year."[4] Shortly after this statement was made, PNL stock reached its all time high on May 13, 1998 of $8.09. In its January 27, 2000 amended 10–Q, PNL represented that "as of September 30, 1998, PNL had approximately 450 members (of which 40 were subscription paying members)." Plaintiffs also allege on the basis of statements by an unidentified witness—a former employee of the company—that PNL had no inside sales force at all prior to August 1999. The only effort to sell PNL's "product" was the use of outside telemarketers, which allegedly yielded no subscriptions. Similar projections were made at the Annual Shareholder's meeting held on December 4, 2000. In response to an investor's question of how many premium subscribers had signed up, Zagoren replied that the company boasted over 8,000 paid subscribers, when in fact, the company had fewer than 20 paid ("premium") subscribers in 2000.[5]

The principals issued a June 1998 press release announcing a "Voluntary Stock Lock-up." There, CEO Jean Collardeau pledged:

> [T]he management of the company … will not sell any of their restricted stock to the public for a period of one year. … Jean Pierre Collardeau, ProNetLink President and CEO and the other members of the executive staff control 16,500,000 shares of restricted stock. … 'We want to show the market and our investors that we are behind ProNetLink and we are here for the long term' said Mr. Collardeau, 'Our goal is to build the most comprehensive import-export tool on the internet.'

This press release was intended to inspire confidence in investors and to quell fears about the viability of PNL's product. The "Voluntary Stock Lock-up" was "extended" on June 15, 1999. The press release stated: "Jean Pierre Collardeau, the President of ProNetLink, who voluntarily locked up his shares last year will continue to do so for an additional year. In addition to the lock-up, Mr. Collardeau has not taken any salary or compensation since the start of the company." Contrary to these representations, the complaint asserts that throughout this period, Collardeau had used secret alter-ego, or "nominee" ac-

---

4. Other claims were frequently made using internet "threads" (message boards) allegedly posted by the principals or Hababou themselves under assumed names.

5. According to the company's October 2000 10–K, the company had approximately 7,500 "registered users," i.e., non-paying users of the company's website. The Annual Report then makes clear that the company received only $7,123 in "premium registration fees," which at the $350 annual fee per user comes out to approximately 20 paying subscribers. Numerous other misrepresentations were allegedly made in press releases and public filings about the company's income stream, fiscal viability, and ownership of shares in "nominee" accounts during the class period. They do not need to be repeated here.

counts, to trade PNL stock for substantial profits. On April 17, 2000, Collardeau sold over a million of his previously-restricted PNL shares for $4.3 million in profit.

The class period has as its end July 2, 2001, which was ProNetLink's disclosure by press release that the company had filed a voluntary petition for bankruptcy under Chapter 7. At this point, subsequently-appointed lead plaintiff Doreen Labit undertook her factual investigation to determine whether to file suit. On April 3, 2003, approximately 22 months after the bankruptcy filing, the instant securities fraud class action was filed.

All defendants move under Rules 9(b) and 12(b)(6) to dismiss the complaint. In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all material factual allegations in the complaint, *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.,* 968 F.2d 196, 198 (2d Cir.1992), and may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief," *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996); *see Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In addition to the facts set forth in the complaint, the Court may also consider documents attached thereto and/or incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998), as well as matters of public record, *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999).

■ As a threshold contention, all defendants assert that all of plaintiffs' claims are time-barred. At the time of PNL's bankruptcy filing, private causes of action under Section 10(b) and Rule 10b–5 had, as an initial statute of limitations, one year from the discovery of the violation.[6] *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The Sarbanes–Oxley Act, passed July 30, 2002, extended that period to two years as to any cause of action that was within the said one year limitation. *See* 28 U.S.C. § 1658(b). Or, in more detail, any 10(b)/Rule 10b–5 claim that was "live"—within its first year—on this date had its limitations period extended to two years from the date of discovery or five years from the violation. 28 U.S.C. § 1658(b)[A](1)-(2). The question of whether the present action was timely filed therefore depends on whether the cause of action was live when Sarbanes–Oxley was enacted. As set forth hereafter, I conclude that plaintiffs have made such a showing and that certainly dismissing the suit on statute of limitations grounds at this point would be premature.

Here, the statute of limitations starts to run when the party bringing the action has actual or constructive notice of its cause of action, the latter meaning when "a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. CIGNA Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993). Inquiry notice in the 10(b)/Rule 10b–5 context, a related concept, does however create a duty to *inquire* that arises when the circumstances—often called "storm warnings"—"would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 168 (2d Cir.2005). However, "the existence of

---

**6.** This was later refined into "inquiry notice," which did not necessarily trigger the statute of limitations, and "constructive notice," which did. *See infra.*

fraud must be a probability not a possibility," and "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss." *Id.* (internal citations omitted). After the duty to inquire arises, knowledge of a cause of action can actually form in the mind of the investor, or this knowledge can be imputed to the investor in one of two ways: (i) "[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date . such inquiry should have revealed the fraud." *Id.* (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir.2003)) (internal citations omitted). While this latter method (the "actual inquiry method") does consider the actual time expended to investigate whether to bring suit, the investor cannot simply extend the statute of limitations by her own foot-dragging, since the test for when plaintiff "will be deemed to have discovered securities fraud for purposes of triggering the statute of limitations ... is an objective one." *Coleman & Co. Securities, Inc. v. Giaquinto Family Trust*, 236 F.Supp.2d 288, 307 (S.D.N.Y.2002).

A bankruptcy filing does not necessarily trigger the statute of limitations by itself if the plaintiff undertakes a diligent inquiry. *See Europadisk Holdings, LLC v. Shelton*, No. 03 Civ. 4505, 2004 WL 613109 at *4 (S.D.N.Y.2004) ("Defendant argues that the Company's June 11, 2002 bankruptcy filing, standing alone, placed plaintiff on inquiry notice of the alleged fraud. We do not find this rule anywhere in the case law, and we decline to adopt it here. While bankruptcy may constitute a storm warning in combination with other circum-

stances, it does not necessarily do so per se."). Whether an inquiry was diligent is a question of fact that should not be decided at the motion to dismiss phase. *See In re Global Crossing, Ltd. Securities Litigation*, 313 F.Supp.2d 189, 203 (S.D.N.Y. 2003).

Against the above, the parties dispute when plaintiffs were put on inquiry notice. Defendants, in a bizarre reverse self-serving assertion designed to exculpate themselves here, contend that the triggering notice of their liability was so much earlier that the statute had run by the time plaintiffs did file in 2002. Thus, the defendants contend that long prior to filing for bankruptcy, not only did PNL release several pieces of information that were "red flags" that put plaintiffs on inquiry notice, but also that plaintiffs did nothing. For example, Collardeau argues that PNL's SEC Form revisions and submissions in 2000 put plaintiffs on actual notice that PNL's earlier membership projections were false, and plaintiffs thus were put on inquiry notice of fraud in 2000 at the latest. Therefore, according to Collardeau, the then one-year statute was triggered too early to overlap with Sarbanes–Oxley, and therefore ran well before plaintiffs' filing. But the fact that the statements were inaccurate does not mean that plaintiffs should have assumed the statements were also fraudulent. The disclosures do not, as a matter of law, indicate the *probability* of defendants' fraud. *Lentell*, 396 F.3d at 168. Also, these disclosures were contravened by several allegedly false and misleading statements that could have caused a reasonable shareholder to think all was well with PNL's business. For example, Collardeau allegedly reassured shareholders at the December 4, 2000 shareholder meeting by speaking of PNL's "very strong revenue-producing possibilities," such as "virtual trade shows" for the Unit-

ed Nations. Cmplt. ¶ 127. When a company's management tempers its statements with "reliable words of comfort," as PNL's management did, investors are not put on notice. *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 155 (2d Cir.2003).

 When PNL filed for bankruptcy, however, it became apparent to the reasonable investor that fraud was a "probability not a possibility." *Lentell,* 396 F.3d at 168. Therefore, plaintiffs were put on inquiry notice of the alleged fraud as of that date. Defendants contend that the statute of limitations began running on that date, but this is only so had plaintiffs with this knowledge done nothing. However, from the record before me, lead plaintiff Labit, on inquiry notice, immediately undertook a sufficiently diligent inquiry upon learning of the bankruptcy. She, lacking the funds to hire an attorney, contacted other PNL shareholders to contribute toward a common fund, and by the end of that month had collected $5000 and retained a New York bankruptcy lawyer. At that attorney's suggestion, Labit applied to the Bankruptcy Court for an examination of the debtor under Rule 2004, Fed. R. Bankr.P. She spearheaded information-gathering efforts among PNL shareholders and was approached by several confidential sources. One of these sources, identified in the complaint as "W–1", claimed Collardeau had been trading millions of dollars in PNL stock through "nominee" accounts. Labit, while disturbed by this information, at this point nevertheless considered it uncorroborated hearsay from a potentially biased former

employee of the company and decided to investigate further. On her attorney's advice, she endeavored to obtain an affidavit, but was unsuccessful. By January 2002, however, Labit and her attorney *had* gathered and reviewed sufficient evidence to form a reasonable belief that fraud was afoot—actual notice—and suit was initiated the next month, February 2002.

Thus, to lay out the statute of limitations timeline: after the bankruptcy filing, totting up the time, the first 28 days after inquiry notice was covered by Lead Plaintiff's diligence, at which point, whether or not actual or constructive notice of a violation was yet clear, were the one year 10(b) statute of limitations to be deemed applicable and commenced, that one year extended to the time of the newly-enacted and overlapping Sarbanes–Oxley two-year extension, 28 U.S.C. § 1658.[7] Thereafter, but well within this overall period this suit was timely filed.[8]

I leave the ultimate determination of Labit's diligence and the timeline for an appropriate occasion, such as summary judgment or trial, should it be raised. *See In re Global Crossing,* 313 F.Supp.2d at 203. The insider trading cause of action is timely in any case, as the statute of limitations under Section 20A of the Exchange Act is five years. 15 U.S.C. § 78t–1(b)(4).

 Defendants Zagoren and accountant Feldman Sherb further contend that plaintiffs have not sufficiently pled scienter. To plead scienter, plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent ... either (a) by alleging facts to show that defendants had both motive and opportunity to commit

7. But the Sarbanes–Oxley Act does not revive time-barred claims. See *In re Enterprise Mortgage Acceptance Co., LLC, Sec Lit.,* 391 F.3d 401, 411 (2d Cir.2004) ("revival of previously stale securities fraud claims has an impermissible retroactive effect").

8. Given the statute of limitations attack on this pleading, the court could have permitted these factual allegations to be made part of the complaint itself, but I do not see the technical necessity of this to reach an appropriate conclusion on this issue.

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). The scienter standard in this circuit was not changed by the passage of the Private Securities Litigation Reform Act. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000). Reviewing the facts alleged in the complaint and submissions, *see* earlier pages hereof, I conclude that scienter is adequately alleged as to Zagoren and Feldman Sherb.

█ Defendants argue that the complaint should be dismissed for failing to allege loss causation. To state a claim under § 10(b), the complaint must allege that plaintiff's injury was caused by his or her reliance on defendant's actions. *See DeMarco v. Robertson Stephens Inc.*, 318 F.Supp.2d 110, 119 (S.D.N.Y.2004). Causation has two prongs: transaction, or "but-for" causation, and "loss causation, i.e., that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001)). Defendants do not contest transaction causation. The complaint adequately alleges loss causation, because it describes a "pump and dump" scheme whereby defendants did "their best to pump up the very bubble that then predictably collapsed." *DeMarco*, 318 F.Supp.2d at 124. Plaintiffs allege that defendants Collardeau and Zagoren lied and concealed the truth to inflate the share price, that Feldman Sherb was reckless or knowing in failing to disclose the truth, and that plaintiffs lost money when the truth was revealed. Defendants' contentions that intervening causes—such as the inability to find further financing or the bursting of the general technology stock bubble—were to blame for the collapse of PNL's share price must await the trial. *See Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003); *DeMarco*, 318 F.Supp.2d at 126.

Plaintiffs assert that the statement in PNL's December 14, 1999 SEC filing that "for the period from Inception through September 30, 1999, [Collardeau] did not receive any compensation for services in any capacity to ProNetLink" is misleading because it does not disclose the surreptitious stock sales, which were his source of "income." Collardeau attacks this, but the statement may or may not have been misleading, depending on Collardeau's view of the monies coming in.

Plaintiffs allege that the following statement in the September 30, 1999 Form 10Q–A2 was misleading:

> "The company's revenue increased from $11,759 for the three-month period ended September 30, 1998, to $241,802 for the three month period ended September 30, 19999. 99.3% of the revenue in 1999 occurred as a result of ProNetLink's bartering transactions."

Cmplt. ¶ 90. I leave this issue to the trial judge.

While defendants Grassi and Sherb & Co. contend that they are not successors in liability of Feldman Sherb, and therefore the suit should be dismissed as against them, the plaintiffs allege facts that put defendants' contentions in issue. I therefore deny the motion to dismiss the suit as against Grassi and Sherb & Co. at this juncture.

Grassi also seeks dismissal on the ground that it did not receive service of the initial April 3, 2003 complaint within 120 days of filing. Rule 4(m) of the FRCP states in relevant part:

> If service of the summons and complaint is not made upon a defendant within 120

days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Even if so, there is no reason to dismiss the action without prejudice as to Grassi, for the properly-consolidated complaint *was served shortly thereafter,* and what is accomplished by a court-permitted reservice of the superseded initial complaint?

■ Defendant Collardeau argues that plaintiff's Section 20(a) claim should be dismissed, because PNL was not named as a defendant. *See Griffin v. PaineWebber, Inc.,* 84 F.Supp.2d 508, 516 (S.D.N.Y.2000). Plaintiffs respond that they did not name PNL because of its bankruptcy, but it appears it should at least be named. *Id.* Accordingly, while the Section 20(a) claim is dismissed without prejudice, plaintiffs are allowed 30 days in which to file an amended complaint naming PNL as a nominal defendant. In all other respects, the Section 20(a) and 20A claims are adequately pleaded.

The foregoing is So Ordered.